SOUTH CAMDEN CITIZENS IN ACTION, Geneva Sanders, Pauline Woods, Barbara Pfeiffer, Julita Gilliard, Oscar Lisboa, Shirley Rios, Phyllis Holmes, Gwen Peterson, Latoya Cooper, and Julio Lugo, Plaintiffs,

v.

NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION and Robert C. Shinn, Commissioner of the New Jersey Department of Environmental Protection, in his official capacity, Defendants,

and

St. Lawrence Cement Co., L.L.C., Defendant–Intervenor.

No. CIV. A. 01–702.

United States District Court, D. New Jersey.

May 10, 2001.

Olga D. Pomar, Camden Regional Legal Services, Inc., Camden, NJ, Jerome Balter, Michael Churchill, Public Interest Law Center of Philadelphia, Philadelphia, PA, Luke W. Cole, Center on Race, Poverty and the Environment, San Francisco, CA, Attorneys for Plaintiffs.

John J. Farmer, Jr., Attorney General of New Jersey, James M. Murphy, Deputy Attorney General, Trenton, NJ, Attorneys for Defendants, the New Jersey Department of Environmental Protection and Robert C. Shinn, Jr., Commissioner of the New Jersey Department of Environmental Protection.

Brian S. Montag, Catherine A. Trinkle, Pitney, Hardin, Kipp & Szuch, LLP, Morristown, NJ, Attorneys for the Defendant–Intervenor, St. Lawrence Cement Co., L.L.C.

## SUPPLEMENTAL OPINION

ORLOFSKY, District Judge

## TABLE OF CONTENTS

I. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .508

II. Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .510

III. Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .513
    A.   Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .513
    B.   The Supreme Court's Decision In Sandoval . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .513
    C.   Whether Plaintiffs May Assert A Claim for Disparate Impact Discrimination, in Violation of the EPA's Implementing Regulations Promulgated Pursuant to § 602, under 42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . .516
        1.   Sandoval Does not Preclude Such a Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . .516
        2.   The Governing Legal Standard for Determining Whether a "Right" Can be Enforced Under § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .518

3. The Differences Between the Cort v. Ash Implied Right of Action Test and the Blessing v. Freestone § 1983 Test ...................... 520

D. Application of § 1983 Analysis to this Case ............................... 524

1. The Plaintiffs' Claim: The EPA's Implementing Regulations Promulgated Under § 602 Create a Federal Right to Be Free of Adverse Disparate Impact Discrimination By Recipients of Federal Funds Pursuant to Title VI .......................................... 524

2. Elements of the § 1983 Claim ...................................... 525

3. A History of the Implementing Regulations Promulgated by Federal Agencies Pursuant to § 602 of Title VI ............................. 529

4. The Blessing Test: Whether the EPA's § 602 Implementing Regulations Confer a Federal "Right" on Plaintiffs which is Enforceable Under § 1983 ......................................... 535

   a. Whether the Regulations Promulgated Under § 602 Were Intended to Benefit Plaintiffs ................................... 535

   b. Whether "the Right Assertedly Protected by the Provision is so 'Vague and Amorphous' That its Enforcement would Strain Judicial Competence" ...................................... 539

   c. Whether the Provision "Unambiguously Imposes A Binding Obligation on The States" ...................................... 541

5. Whether Congress Has Expressly or Impliedly Foreclosed Plaintiffs' Ability to Enforce the EPA's Disparate Impact Regulations, Promulgated Pursuant to Title VI, Under § 1983 ...................... 542

IV. The Availability of Injunctive and Declaratory Relief in this Case ................. 547

V. Conclusion .................................................... 549

## I. INTRODUCTION

On April 19, 2001, this Court granted Plaintiffs' request for a preliminary injunction and a declaratory judgment based upon the allegation that the New Jersey Department of Environmental Protection ("NJDEP") and NJDEP Commissioner Robert Shinn ("Shinn") had violated § 602 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d–1, and the EPA's implementing regulations thereto, codified at 40 C.F.R. § 7.10 et seq., by failing to consider the potential adverse, disparate impact of their decision to grant St. Lawrence Cement Co.'s ("SLC") application for air permits to operate its proposed facility. See South Camden Citizens in Action ("SCCIA"), et. al. v. New Jersey Department of Environmental Protection, et. al., ("SCCIA I"), 145 F.Supp.2d 446 (D.N.J. 2001)(Orlofsky, J.). That determination was based upon the assumption that an implied private right of action existed under § 602 of Title VI, a cause of action

which had recently been recognized in this Circuit in Powell v. Ridge, 189 F.3d 387 (3d Cir.1999), cert. denied, 528 U.S. 1046, 120 S.Ct. 579, 145 L.Ed.2d 482 (1999). SCCIA I, 145 F.Supp.2d at 472. I noted in SCCIA I that the precise question of whether an implied private right of action was available to enforce disparate impact regulations promulgated under Title VI was pending before the Supreme Court. Id.; see Sandoval v. Hagan, 197 F.3d 484 (11th Cir.1999), cert. granted, 530 U.S. 1305, 121 S.Ct. 28, 147 L.Ed.2d 1051 (2000). I concluded, however, in SCCIA I, that I was bound by the Third Circuit's decision in Powell to recognize such a claim. Id.

On the morning of April 24, 2001, five days after this Court filed its Opinion and Order in SCCIA I, the Supreme Court held that § 602 does not provide an implied private right of action to enforce disparate impact regulations promulgated

by federal agencies pursuant to § 602. *See Alexander v. Sandoval,* —— U.S. ——, 121 S.Ct. 1511, 149 L.Ed.2d 517, 2001 WL 408983 (April 24, 2001).

On the afternoon of April 24, 2001, this Court convened a telephone conference call on the record with all counsel to address the impact of the Supreme Court's decision in *Sandoval* on this case. *See* Transcript of Conference Call I ("Trans. Conf. Call I"), April 24, 2001. In light of the Supreme Court's decision in *Sandoval,* the parties were asked to brief the following two questions: (1) Whether Plaintiffs are entitled to preliminary injunctive relief on the ground that the NJDEP and Commissioner Shinn intentionally discriminated against them on the basis of race, color, or national origin, in violation of § 601 of Title VI of the Civil Rights Act of 1946, 42 U.S.C. § 2000d; and (2) Whether Plaintiffs are entitled to preliminary injunctive relief based upon 42 U.S.C. § 1983,[1] specifically, whether the disparate impact regulations promulgated to enforce Title VI can be enforced through a § 1983 action.

The Supreme Court's decision in *Sandoval* clearly held that private individuals can no longer sue directly under § 602 to enforce the disparate impact regulations promulgated under Title VI of the Civil Rights Act of 1964. The question presented to this Court for the first time, and perhaps for the first time to any federal court, is whether the same disparate impact regulations which can no longer be enforced through a private right of action brought directly under § 602 of Title VI, can be enforced pursuant to 42 U.S.C. § 1983.

For the reasons set forth below, I conclude that: (1) the Supreme Court's decision in *Sandoval* does not preclude Plaintiffs from pursuing their claim for disparate impact discrimination, in violation of the EPA's implementing regulations to Title VI, under 42 U.S.C. § 1983; and (2) Plaintiffs are entitled to preliminary injunctive relief based upon a claim for disparate impact discrimination in violation of the EPA's implementing regulations to Title VI, brought under 42 U.S.C. § 1983.[2] Accordingly, SLC's motion to vacate this Court's Opinion and Order of April 19, 2001 (*SCCIA I* ), granting Plaintiffs' application for a preliminary injunction, or in the alternative, seeking a stay of that Order pending appeal, is denied. Therefore, this Court's Order of April 19, 2001 shall remain in full force and effect.[3]

---

1. Section 1983 provides, in relevant part, as follows:

    Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .
    *See* 42 U.S.C. § 1983.

2. In light of this conclusion, I need not address at this time whether plaintiffs are entitled to preliminary injunctive relief based

upon their claim of intentional discrimination in violation of § 601 of Title VI.

3. That Order provides, in relevant part, as follows:

    1. Plaintiffs' motion for a preliminary injunction is granted;
    2. The issuance of the air permits by the New Jersey Department of Environmental Protection to St. Lawrence Cement Co., L.L.C. is vacated;
    3. St. Lawrence Cement Co., L.L.C. is enjoined from operating its proposed facility until further Order of this Court;
    4. This case is remanded to the New Jersey Department of Environmental Protection and Commissioner Shinn to make appro-

I incorporate the findings of facts and conclusions of law set forth in *SCCIA I* except as noted below. My application of the Third Circuit's test for preliminary injunctive relief is unchanged by this Supplemental Opinion, except insofar as I assumed, in *SCCIA I*, that Plaintiffs were entitled to bring a private cause of action under § 602 itself, and have now concluded that Plaintiffs are entitled to assert the same claim under 42 U.S.C. § 1983. In considering Plaintiffs' application for preliminary injunctive relief, I specifically note that the following findings of fact and conclusions of law set forth in *SCCIA I* are incorporated into, and unaltered by, this Supplemental Opinion: (1) Plaintiffs are likely to succeed on the merits of their claim that the NJDEP's facially neutral policy resulted in adverse disparate impact discrimination against Plaintiffs in violation of the EPA's Title VI implementing regulations; (2) Plaintiffs will suffer irreparable harm to their health and environment in the absence of an injunction; (3) Neither NJDEP, nor SLC will be irreparably harmed through the grant of preliminary injunctive relief; and (4) the granting of Plaintiffs' request for preliminary injunctive relief is in the public interest.

## II. PROCEDURAL HISTORY

On April 19, 2001, this Court filed an Opinion and Order granting Plaintiffs' request for a declaratory judgment and preliminary injunctive relief. The facts and circumstances giving rise to this action are set forth in that Opinion, and will not be repeated here. *See SCCIA I,*. In that Opinion, this Court applied the requisite four-factor test for determining whether to grant preliminary injunctive relief. *See SCCIA I,* 145 F.Supp.2d at 470, ¶ 118.[4] Specifically, this Court found that Plaintiffs were likely to succeed on the merits of their claim that the NJDEP's permitting criteria and methods resulted in disparate impact discrimination in violation of § 602 of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d–1. *SCCIA I,* 145 F.Supp.2d at 470–97, ¶¶ 118–226. Furthermore, this Court found that Plaintiffs had demonstrated that they would suffer irreparable harm in the absence of injunctive relief, that neither NJDEP nor SLC will be irreparably injured by the grant of injunctive relief, and that the public interest favored granting the injunctive relief requested. *Id.*

On April 24, 2001, five days after this Court rendered its decision in *SCCIA I,*

---

priate findings consistent with the Opinion filed concurrently with this Order;
5. The findings made by the New Jersey Department of Environmental Protection and Commissioner Shinn shall be filed with this Court within thirty days of the date of this Order;
6. This Court shall retain jurisdiction of this case.
*See* Order, No. 01–702, April 19, 2001.

4. As I stated in *SCCIA I:*
Before a District Court may grant preliminary injunctive relief in this Circuit, a court must weigh the following four factors: (1) the likelihood of the movant's success on the merits; (2) whether the movant will be irreparably injured if relief is not granted; (3) whether the party to be enjoined will suffer irreparable injury if the preliminary relief is granted; and (4) whether the public interest will be served by the preliminary injunctive relief. *See Doe v. Nat'l Bd. of Medical Examiners,* 199 F.3d 146, 154 (3d Cir.1999) ( quoting *American Civil Liberties Union of New Jersey v. Black Horse Pike Regional Bd. of Educ.,* 84 F.3d 1471, 1477 n. 2 (3d Cir.1996)) (en banc); *In Re Arthur Treacher's Franchisee Litigation,* 689 F.2d 1137, 1143 (3d Cir.1982); *Association for Fairness, Inc. v. New Jersey,* 82 F.Supp.2d 353, 359 (D.N.J.2000) (Orlofsky, J.). *SCCIA I,* 145 F.Supp.2d at 470, ¶ 118.

the Supreme Court issued a decision in *Alexander v. Sandoval,* —— U.S. ——, 121 S.Ct. 1511, 149 L.Ed.2d 517, 2001 WL 408983 (April 24, 2001). In *Sandoval,* Justice Scalia, writing for a five-four majority of the Supreme Court, held that "[n]either as originally enacted nor as later amended does Title VI display an intent to create a freestanding private right of action to enforce regulations promulgated under § 602. We therefore hold that no such right of action exists." —— U.S. ——, ——, 121 S.Ct. 1511, 1523, 149 L.Ed.2d 517, 2001 WL 408983 at *10. With this holding, the Supreme Court clearly overruled that portion of the Third Circuit's decision in *Powell* which held that an implied right of action existed under § 602. To the extent that this Court's analysis in *SCCIA I* was predicated on *Powell's* holding that § 602 provides an implied private right of action to enforce the regulations promulgated under § 602, the Supreme Court's decision in *Sandoval* also overruled this Court's opinion in *SCCIA I.*

Within hours of the Supreme Court's issuance of the *Sandoval* decision, this Court convened a telephone conference call with all counsel in this case to discuss the impact of *Sandoval* on this Court's holding in *SCCIA I. See* Trans. Conf. Call I. All counsel agreed with this Court that the Supreme Court's decision in *Sandoval* overruled the Third Circuit's decision in *Powell,* upon which this Court had relied in reaching its decision in *SCCIA I,* specifically, that § 602 contains an implied private right of action. Trans. Conf. Call I at 11.

Counsel for SCCIA argued, however, that the preliminary injunction issued by this Court on April 19, 2001, should remain in effect because Plaintiffs were entitled to preliminary injunctive relief, notwithstanding the Supreme Court's decision in *Sandoval.* First, Plaintiffs argued that their

claim for intentional discrimination, brought under § 601, provided a basis for this Court's continuance of the preliminary injunction. Second, citing Justice Stevens' dissenting opinion in *Sandoval,* Plaintiffs contended that their claim of disparate impact discrimination, originally brought under § 602, could be brought under 42 U.S.C. § 1983. Trans. Conf. Call I at 3.

Counsel for SLC argued that the preliminary injunction issued by this Court in *SCCIA I* should be vacated by this Court *sua sponte* in light of the Supreme Court's decision in *Sandoval,* pursuant to Federal Rule of Civil Procedure 60(b). Trans. Conf. Call I at 5. Counsel for NJDEP concurred. *Id.* at 6–7. In the alternative, counsel for SLC requested that this Court stay its injunction, pending the disposition of a motion for reconsideration. *Id.* at 9.

After hearing arguments from counsel for SCCIA, NJDEP, and SLC, this Court instructed the parties to file supplemental briefs analyzing the impact of the Supreme Court's decision in *Sandoval* on Plaintiffs' Complaint. Trans. Conf. Call I at 10–12, 16. The Court gave the parties until 9:00 a.m., Thursday, April 26, 2001, or approximately thirty-six hours from the time of the conference call, to submit their supplemental briefs. *Id.* at 24–25. Finally, the Court indicated that, since the Court and all parties were aware of the Court's obligation to reconsider its decision in *SCCIA I* in light of the Supreme Court's decision in *Sandoval,* the Court would not require SLC to go through the formality of filing a motion for reconsideration. *Id.* at 23.

On April 25, 2001, SLC filed an Order to Show Cause for Preliminary Injunction Pending Appeal and a Motion to Vacate Opinion and Order or, in the alternative, for Stay of Order Pending Appeal. *See* Order to Show Cause, No. 01–702 (filed April 25, 2001). In the brief it submitted in support of the Order to Show Cause for

Preliminary Injunction Pending Appeal and the Motion to Vacate or, Stay, SLC argued that the Supreme Court's decision in *Sandoval* mandated that this Court immediately vacate its Opinion and Order in *SCCIA I*.

On April 25, 2001, Plaintiffs filed a motion for leave to amend their complaint to allege a cause of action for disparate impact discrimination, in violation of the EPA's Title VI implementing regulations, codified at 40 C.F.R. § 7.10 *et seq*, based on 42 U.S.C. § 1983. *See* Pls.' Motion for Leave to Amend Complaint, No. 01–702 (filed April 25, 2001).

On the afternoon of April 25, 2001, this Court convened a second telephone conference call on the record to address these motions. *See* Transcript of Conference Call II ("Trans. Conf. Call II"), April 25, 2001. With respect to Plaintiffs' motion for leave to amend their Complaint, the Court considered Plaintiffs' argument that leave should be granted in the interest of justice, and SLC's argument in opposition that leave to amend should be denied based on the prejudice SLC would suffer if the motion were granted. Trans. Conf. Call II at 2–3, 6–16. After considering the arguments of counsel, the Court concluded that Plaintiffs' motion to amend would not cause any legal prejudice to Defendants. Specifically, the Court noted that the Plaintiffs' proposed amendment was a technical amendment asserting an alternative legal basis for the relief sought in Plaintiffs' original Complaint, and would not require the presentation of any additional evidence. *Id.* at 13–22. The Court further concluded that the prejudice identified by counsel for SLC, namely, the economic harm SLC would suffer from the continuance of the injunction, is not the kind of prejudice which would defeat a motion for leave to amend under Federal Rule of Civil Procedure 15(a), which man-

dates that leave to amend "be freely given when justice so requires." *Id.* 13–14 (citing *Foman v. Davis*, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962) and Fed.R.Civ.P. 15(a)). Accordingly, this Court granted Plaintiffs' motion for leave to amend their Complaint to assert a cause of action under 42 U.S.C. § 1983, alleging the discriminatory impact of NJDEP's permitting practices under the EPA's implementing regulations to Title VI of the Civil Rights Act of 1964.

With respect to SLC's Order to Show Cause and Motion to Vacate or Stay, the Court explained that it was fully aware of its obligation to reconsider its decision in *SCCIA I* in light of the Supreme Court's decision in *Sandoval*, and was proceeding to do so as expeditiously as possible. Trans. Conf. Call II at 26. As this Court explained:

> I am resolving [the question of whether to dissolve or stay the preliminary injunction] as part of this process. I hope to render a decision as quickly as possible. I can't tell [counsel] how quickly I'm going to do it until I read your papers, but since [counsel] raised it, I think I ought to address it. There are serious public health issues presented in this case and to vacate ... without giving plaintiffs an opportunity—or vacate the injunction or stay the injunction and allow the plant to begin operations without giving the plaintiffs an opportunity to demonstrate to me that they're entitled to preliminary injunctive relief based on the existing record, it seems to me, raises serious issues with regard to the public health of the citizens of Waterfront South.
>
> I assure [counsel for SLC and SLC] that I am moving as expeditiously as possible. We had a conference call within hours of the Supreme Court's decision in the *Sandoval* case. I established a

briefing schedule of tomorrow morning at 9 o'clock. Frankly, I would have been ready to proceed even faster than that, but [counsel for SCCIA] indicated that she had other commitments that she couldn't put off. Now, it seems to me that it's almost exalting form over substance for me to set down a return date for an order to show cause. I'm considering all those issues already. I was considering them before [counsel for SLC] filed the papers. I'm simply waiting for the brief on the merits, and as I read the brief that [counsel for SLC] submitted in support of the order to show cause, it really doesn't address the merits of plaintiffs' claims. It simply addresses the fact that the *Sandoval* decision of the Supreme Court overruled the basis for my decision because there is no longer a private right of action under Title VI. I mean, there is no dispute about that. And if that were the only claim in the case, I would have vacated the injunction yesterday.

\*    \*    \*    \*    \*    \*

I am not going to set a return date for the order to show cause. I am considering the issues raised in the order to show cause as we speak. I was considering them before [counsel for SLC] filed the papers, and to me this was an unnecessary exercise. I understand that [SLC] insisted that [counsel for SLC] file the papers, but of course I'm considering those issues. I didn't ask [counsel for SLC] to file a motion for reconsideration, and I didn't ask [counsel for SCCIA] to file a formal motion to have a return date on the motion to amend. I'm trying to move this as quickly as possible. But, certainly, I'm considering the issues which [counsel for SLC] raised in the order to show cause. I don't think it's necessary to set a return date.

Now, what I will do ... is that after I receive the papers tomorrow and I've had a chance to read them and you've all had the chance to read your adversary's papers, if you want argument, if you want to come down and argue, I'll be happy to schedule oral argument. But I read your papers already on the order to show cause ... and I'm already considering those issues.

*Id.* at 26–28.

## III.  DISCUSSION

### A.  Introduction

This Supplemental Opinion sets forth the Court's conclusions of law regarding the impact of the Supreme Court's decision in *Sandoval* on this Court's opinion in *SCCIA I.* I incorporate by reference the findings of fact and conclusions of law set forth in *SCCIA I,* with the exception of those conclusions of law relating to the existence of a private right of action under § 602 of Title VI, which have been overruled by *Sandoval.*

### B.  The Supreme Court's Decision in *Sandoval*

In order to determine the impact of the Supreme Court's decision in *Sandoval* on this case, I must first consider the precise holding in *Sandoval.* As Justice Scalia pointedly reminded us in the majority Opinion he authored in *Sandoval,* courts are "bound by holdings, not language." *Sandoval,* —— U.S. ——, ——, 121 S.Ct. 1511, 1517, 149 L.Ed.2d 517. With Justice Scalia's admonition in mind, I shall now examine the Supreme Court's holding in *Sandoval* in detail, in an effort to determine its impact on this case.

*Sandoval* involved a class action claim brought by non-English-speaking residents of the State of Alabama against the Director of the Alabama Department of Public Safety, alleging that because the

Alabama Department of Public Safety offered Alabama's driver's licensing exam only in English, the class suffered disparate impact discrimination on the basis of their national origin in violation of Title VI of the Civil Rights Act of 1964, and the implementing regulations promulgated pursuant to § 602 by the Departments of Justice and Transportation. *Sandoval,* —— U.S. ——, ——, 121 S.Ct. 1511, 1515, 149 L.Ed.2d 517.

Section 601 of Title VI provides that no person shall, "on the ground of race, color, or national origin, be denied the benefits of, or be subjected to discrimination under any program or activity" covered by Title VI. 42 U.S.C. § 2000d. Section 602 of Title VI authorizes federal agencies to "effectuate the provisions of [§ 601] ... by issuing rules, regulations, or orders of general applicability." 42 U.S.C. § 2000d–1.

Both the Department of Justice and the Department of Transportation have promulgated implementing regulations to Title VI of the Civil Rights Act of 1964, pursuant to § 602. *See* 28 C.F.R. § 42.104(b)(2) (DOJ regulations) and 49 C.F.R. § 21.5(b)(2) (DOT regulations). These regulations prohibit recipients of federal funds from, *inter alia,* "utilizing criteria or methods of administration which have the effect of subjecting individuals to discrimination because of their race, color, or national origin." 28 C.F.R. § 42,104(b)(2). Because the Alabama Department of Public Safety accepts grants of financial assistance from the United States Department of Transportation and the United States Department of Justice, it is subject to Title VI. *Sandoval,* —— U.S. ——, ——, 121 S.Ct. 1511, 1515, 149 L.Ed.2d 517.

In *Sandoval,* the plaintiff class asserted its claim for disparate impact discrimination exclusively as a private right of action under § 602 of Title VI. *See Sandoval v.*

*Hagan,* 7 F.Supp.2d 1234, 1253 n. 15 (M.D.Ala.1998) ("[T]he plaintiffs in the case at bar are not asserting Title VI rights via § 1983. Rather, Plaintiffs contend that they have a direct cause of action under Title VI and its implementing regulations.") Their claim was premised on the theory that § 602:(1) permits the promulgation, by federal agencies, of implementing regulations which prohibit disparate impact discrimination; and (2) affords an implied private right of action to private individuals to file suit in federal court to enforce such implementing regulations.

As Justice Scalia plainly stated in his majority Opinion in *Sandoval,* the Supreme Court's decision in *Sandoval* addressed only the second of the plaintiffs' theories concerning § 602: "[t]he petition for writ of *certiorari* raised, and we agreed to review, only the question posed in the first paragraph of this opinion: whether there is a private cause of action to enforce the [implementing] regulation." *Sandoval,* —— U.S. ——, ——, 121 S.Ct. 1511, 1515, 149 L.Ed.2d 517. The Supreme Court "[did] not inquire [in *Sandoval* ] whether the DOJ regulation was authorized by § 602, or whether the courts below were correct to hold that the [contested policy] had the effect of discriminating on the basis of national origin." *Id.* Instead, the Court stated that:

> [W]e must assume for purposes of deciding this case that regulations promulgated under § 602 of Title VI may validly proscribe activities that have a disparate impact on racial groups, even through such activities are permissible under § 601. Though no opinion of this Court has held that, five justices in *Guardians* voiced that view of the law at least as alternative grounds for their decisions, *see* 463 U.S. at 591–92, 103 S.Ct. 3221 (opinion of White, J.); *id.* at 623, n. 15, 103 S.Ct. 3221 (Marshall, J., dissenting);

*id.* at 643–654, 103 S.Ct. 3221 (Stevens, J. joined by Brennan and Blackmun, JJ., dissenting), and dictum in *Alexander v. Choate* is to the same effect, *see* 469 U.S. 293, 295, n. 11, 105 S.Ct. 712. These statements are in considerable tension with the rule of *Bakke* and *Guardians* that § 601 forbids only intentional discrimination, *see, e.g. Guardians Assn. v. Civil Serv. Comm'n of New York City, supra,* at 612–613, 103 S.Ct. 3221 (O'Connor, J., concurring in judgment), but petitioners have not challenged the regulations here. *We therefore assume for the purposes of deciding this case that the DOJ and DOT regulations proscribing activities that have a disparate impact on the basis of race are valid. Sandoval,* —— U.S. ——, 121 S.Ct. 1511, 1517, 149 L.Ed.2d 517 (emphasis added).

Having thus defined the scope of its review, the majority in *Sandoval* proceeded to analyze two sources of law in order to determine whether Congress intended to create a private right of action under § 602:(1) Supreme Court precedent interpreting Title VI; and (2) the text and structure of Title VI itself.

First, the Court reviewed its holdings in the seminal cases of *Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974) (holding that § 601 prohibits disparate impact discrimination); *Cannon v. University of Chicago,* 441 U.S. 677, 694, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (holding that a private right of action exists to enforce Title IX, which is "patterned after Title VI,"); *Regents of Univ. of California v. Bakke,* 438 U.S. 265, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (holding that § 601 proscribes only intentional discrimination); *Guardians Ass'n v. Civil Serv. Comm'n of New York City,* 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983) (affirming *Bakke'*s holding that § 601 prohibits only intentional discrimination); and *Alexander v. Choate,* 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985) (same). *See Sandoval,* —— U.S. ——, ———–——, 121 S.Ct. 1511, 1517–1521, 149 L.Ed.2d 517. Based on its analysis of the holdings in these cases, the Supreme Court concluded that "[n]either [*Guardians* ], nor any other [case] in this Court, has held that the private right of action exists." *Id.* at ——, 121 S.Ct. 1511.

The Court then considered the text and structure of Title VI. First, the Court reviewed § 602's language that federal agencies may "effectuate" § 601, and held that "[s]o far as we can tell, this authorizing portion of § 602 reveals no congressional intent to create a private right of action." *Id.* at ——, 121 S.Ct. at 1521. Second, the Court considered the methods that § 602 provides for enforcement, namely, either the termination of "funding to the 'particular program, or part thereof,' that has violated the regulation or [enforcement] 'by any other means authorized by law,'" and concluded that these methods do not "manifest an intent to create a private remedy." *Sandoval,* —— U.S. ——, ——, 121 S.Ct. 1511, 1521, 149 L.Ed.2d 517 (citing 42 U.S.C. § 2000d–1). After reviewing various restrictions on agency enforcement of § 602, the Court concluded that these restrictions "tend to contradict a congressional intent to create privately enforceable rights through § 602 itself." *Id.* at ——, 121 S.Ct. at 1521. Third, the Court considered and rejected plaintiffs' argument that the regulations must be privately enforceable because they contain rights-creating language, stating that "[l]anguage in a regulation may invoke a private right of action that Congress through statutory text created, but it may not create a right that Congress has not." *Id.* Finally, the Court considered plaintiffs' argument that Congress "ratified" a jurisprudentially-created private cause of action under § 602 in amendments to Title VI which Congress

passed in 1986 and 1987. *See* Rehabilitation Act Amendments of 1986, § 1003, 42 U.S.C. § 2000d–7; Civil Rights Restoration Act of 1987, § 6, 42 U.S.C. § 2000d–4a. The Court rejected this argument, based on: (1) its conclusion that its jurisprudence never created such a right; and (2) its conclusion that congressional intent to "ratify" a private cause of action could not be inferred from the fact that Congress was silent on this issue when it enacted the comprehensive revisions to Title VI which were contained in the 1986 and 1987 amendments. *Id.* at ——, 121 S.Ct. at 1523.

Based on the foregoing analysis, Justice Scalia, writing for the majority, concluded with the following unequivocal statement of the Court's holding in *Sandoval*: "Neither as originally enacted nor as later amended does Title VI display an intent to create a freestanding private right of action to enforce regulations promulgated under § 602. We therefore hold that no such right of action exists." *Id.*

### C. Whether Plaintiffs May Assert a Claim for Disparate Impact Discrimination, in Violation of the EPA's Implementing Regulations Promulgated Pursuant to § 602, under 42 U.S.C. § 1983

#### 1. *Sandoval* Does Not Foreclose the Possibility of Such a Claim

■ This Court undertook the preceding analysis of the Supreme Court's Opinion in *Sandoval* to divine exactly what the Court held in *Sandoval*, in an effort to determine the impact of *Sandoval* upon this case. The foregoing analysis, however, is equally valuable insofar as it illuminates what the Supreme Court did *not* hold in *Sandoval*.

Specifically, upon a careful review of Justice Scalia's majority opinion in *Sandoval*, it is clear that the impact of the Supreme Court's holding in *Sandoval* on this case is limited to its holding that § 602 of Title VI does not create an implied private cause of action to enforce agency regulations promulgated under § 602 which prohibit disparate impact discrimination. I reach this conclusion for four reasons. First, as Justice Scalia repeatedly emphasized, the petition for *certiorari* presented, and the Supreme Court reviewed, *only* the question of whether § 602 itself creates what Justice Scalia termed a "freestanding," or independent, private right of action. *See Sandoval*, —— U.S. ——, —— – ——, ——, ——, 121 S.Ct. 1511, 1515–1517, 1519, 1523, 149 L.Ed.2d 517. Second, Justice Scalia took pains to point out that because the validity of the Title VI implementing regulations promulgated by the DOJ and DOT were not contested in *Sandoval*, the Court's holding in *Sandoval* does not address or invalidate the disparate impact regulations promulgated under § 602 of Title VI, or the many cases in which the Supreme Court has assumed such a right exists. *Id.* at —— – ——, 121 S.Ct. at 1515–1517. As he noted repeatedly:

We do not inquire here whether the DOJ regulation was authorized by § 602. *Id.* at ——, 121 S.Ct. at 1515;

We must assume for purposes of deciding this case that regulations promulgated under § 602 may validly proscribe activities that have a disparate impact on racial groups, even though such activities are permissible under § 601. *Id.* at ——, 121 S.Ct. at 1517;

As stated earlier, we assume for the purposes of this decision that § 602 confers the authority to promulgate disparate-impact regulation; the question remains, whether it confers a private right to enforce them. *Id.* at ——, 121 S.Ct. at 1519.

Third, the Court limited the question decided in *Sandoval* to determining whether Congress intended to create a private *remedy* to enforce § 602, while assuming that in fact Congress intended that statute, to create a substantive *right:* "The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent not just to create a private right, but also a private remedy." *Id.* at ——, 121 S.Ct. at 1519 (citation omitted). Finally, a careful review of the Supreme Court's jurisprudence on the issue of implied remedy, beginning with the Court's holding twenty years ago in *Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Assoc.*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981), cited by the Supreme Court in *Sandoval*, —— U.S. ——, —— — ——, 121 S.Ct. 1511, 1521–1522, 149 L.Ed.2d 517, reveals the Court's recognition of the critical distinction in the judicial analysis required to divine Congressional intent to create such a private right of action, and the very different question of Congressional intent to create such a remedy via, for example, § 1983.

For example, in *Nat'l Sea Clammers Assoc.*, 453 U.S. at 13–20, 101 S.Ct. 2615 the Court considered both the question of whether the statute at issue in that case afforded an implied private right of action, and, alternatively, whether the same statute could provide the basis for a § 1983 action:

> Where, as here, Congress has made it clear that implied private actions are not contemplated, the courts are not authorized to ignore this legislative judgment. Although the parties have not suggested it, there remains a possible alternative source of *express* congressional authorization of private suits under these Acts . . . it could be argued that respondents may sue the municipalities and sewerage boards among the petitioners under [the Acts] by virtue of a right of action created by § 1983. . . . [I]f controlling, this argument would obviate the need to Consider whether Congress intended to authorize private suits to enforce these particularly federal statutes.

*Id.* at 18–19, 101 S.Ct. 2615.

Significantly, for the purposes of this case, it is clear for the reasons I have just explained that the *Sandoval* opinion does not, as NJDEP and SLC argue, prevent Plaintiffs in this case from pursuing *any* cause of action involving § 602. *See* NJDEP Suppl. Br. at 6; SLC Suppl. Br. at 22. More specifically, *Sandoval* does not foreclose Plaintiffs from seeking to vindicate the rights they allege § 602 and its implementing regulations create through § 1983. In arguing to the contrary, both NJDEP and SLC urge this Court to interpret *Sandoval* in a way which goes well beyond the narrow holding in that case. The essence of the NJDEP's and SLC's misunderstanding of *Sandoval* lies in their conflation of rights with remedies in their analysis of the Supreme Court's holding in *Sandoval.*

Specifically, the NJDEP and SLC argue that in *Sandoval*, the Court held that individual plaintiffs are entirely foreclosed from bringing any cause of action based upon alleged violations of the disparate impact implementing regulations promulgated under § 602. To support this argument, the NJDEP cites to the following language: "Neither as originally enacted nor as later amended does Title VI display an intent to create a freestanding private right of action to enforce regulations promulgated under § 602. We therefore hold that no such right of action exists." NJDEP Suppl. Br. at 6 (citing *Sandoval*, —— U.S. ——, 121 S.Ct. 1511, 1523, 149 L.Ed.2d 517.) As is evident from the very text the NJDEP cites, however, and for the reasons I have already discussed in

detail, *Sandoval*'s holding is limited to the question of whether, in Justice Scalia's words, a "freestanding private right of action" exists under § 602.

SLC directs this Court's attention to a different section of Justice Scalia's majority Opinion, an analysis of which, it argues, mandates the same conclusion, namely, that *Sandoval* precludes Plaintiffs in this case from pursuing this cause of action under § 1983:

> Whereas § 601 decrees that '[n]o person ... shall ... be subjected to discrimination,' the text of § 602 provides that '[each Federal department and agency ... is authorized and directed to effectuate the provisions of [§ 601].]' Far from displaying congressional intent to create new rights, § 602 limits agencies to "effectuat[ing] rights already created by § 601."

SLC Suppl. Br. at 24 (citing *Sandoval*, — U.S. ——, ——, 121 S.Ct. 1511, 1521). SLC's argument is flawed for several reasons. First, this Court must be guided by Justice Scalia's admonition in *Sandoval*, that courts are bound by "holdings, not language." That admonition prohibits this Court from reading the *dicta* cited by SLC to be part of the holding in *Sandoval*. Moreover, as I have already explained in detail, the Court in *Sandoval* did not reverse the plurality's holding in *Guardians*, that the disparate impact regulations at issue in that case should be upheld. Instead, in *Sandoval*, the Court explicitly assumed the validity of the § 602 implementing regulations. Finally, I note that the portion of the *Sandoval* opinion which SLC quotes, when read in context, is part of the Court's consideration of the question of Congressional intent to create a private right of action in § 602 itself, and is not dispositive of the question of whether a cause of action to enforce the § 602 regulations may be asserted under § 1983.

The holding in *Sandoval* is explicitly limited to the determination that § 602 *itself* does not create a right of private action. Therefore, I conclude, as a threshold matter, that the Court's holding in *Sandoval* does not foreclose Plaintiffs in this case from bringing a claim for disparate impact discrimination, in violation of the EPA's § 602 implementing regulations, under 42 U.S.C. § 1983.

This conclusion is consistent with governing precedent in the Third Circuit, specifically, *Powell v. Ridge*, 189 F.3d 387 (3d Cir.1999), in which the Court held that plaintiffs seeking to enforce the disparate impact regulations promulgated under § 602 may do so by bringing suit under § 602 itself and/or by bringing suit under 42 U.S.C. § 1983. *Powell*, 189 F.3d at 403. While it is clear that the Third Circuit's holding that § 602 itself contained an implied private right of action has been overruled by *Sandoval*, it is equally clear that *Sandoval* did not address, nor does it affect, Plaintiffs' right to bring a claim for disparate impact discrimination in violation of the § 602 regulations under § 1983. The Third Circuit's analysis in *Powell* includes an extensive discussion of the *Powell* plaintiffs' ability to assert a claim for violation of the § 602 regulations under § 1983. *See Powell*, 189 F.3d at 399–403. For the reasons I have already set forth, the Third Circuit's analysis of § 1983 in *Powell* is not affected or overruled by the Supreme Court's ruling in *Sandoval* and remains the governing law of this Circuit. Accordingly, this Court is bound to follow it.

### 2. The Governing Legal Standard for Determining Whether a "Right" May Be Enforced Under § 1983

Having concluded that the Supreme Court's opinion in *Sandoval* does not preclude the SCCIA plaintiffs from asserting

a § 1983 action for disparate impact discrimination in violation of the EPA's § 602 implementing regulations, I must now consider whether Plaintiffs may in fact pursue such a claim under § 1983. Section 1983 provides, in relevant part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress....

42 U.S.C. § 1983. In this case, Plaintiffs must first demonstrate that their Complaint meets the statutory requirements of § 1983, by showing that they have asserted their claim against a "person," who, "under color of state law," deprived Plaintiffs of "rights, privileges, or immunities secured by the Constitution and laws" of the United States.

The Supreme Court has explained that, once plaintiffs seeking a remedy under § 1983 demonstrate that they can meet the requisite statutory elements for a § 1983 claim:

> [A] determination that § 1983 is available to remedy a statutory or constitutional violation involves a two-step inquiry. First, the Plaintiff must assert the violation of a federal right.... Second, even when the plaintiff has asserted a federal right, the defendant may show that Congress "specifically foreclosed a remedy under § 1983," by providing a "comprehensive enforcement mechanis[m] for protection of a federal right."

*Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 106, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989) (citations omitted).

With respect to the first part of this inquiry, the Court has emphasized that "[i]n order to seek redress through § 1983, [ ] a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law.*" *Blessing v. Freestone*, 520 U.S. 329, 340, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997) (citation omitted) (emphasis in original). To determine whether a federal statute creates an individual right, the Court utilizes a three-part analysis, most recently articulated in *Blessing*, 520 U.S. at 340–41, 117 S.Ct. 1353:

> First, Congress must have intended that the provision in question benefit the plaintiff. Second, the plaintiff must demonstrate that the right assertedly protected by the statute is not so "vague and amorphous" that its enforcement would strain judicial competence. Third, the statute must unambiguously impose a binding obligation on the States. In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms.

*Blessing*, 520 U.S. at 340–341, 117 S.Ct. 1353 (citations omitted). Describing this analysis in *Livadas v. Bradshaw*, the Court explained that "apart from [some] exceptional cases, § 1983 remains a generally and presumptively available remedy for claimed violations of federal law." 512 U.S. 107, 132, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994).

If, upon application of the *Blessing* analysis, a court finds that plaintiffs have identified a federal right which has allegedly been violated, a rebuttable presumption is created that the right is enforceable under § 1983. *Blessing*, 520 U.S. at 341, 117 S.Ct. 1353. The presumption in favor of allowing Plaintiffs to proceed under § 1983, arises because, in recognition of Congress's express intent to allow individuals the opportunity to vindicate federal

rights through § 1983, courts "do not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy for the deprivation of a federally secured right." *Wright v. City of Roanoke*, 479 U.S. 418, 423–24, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987) (citation omitted); *see also Golden State Transit Corp.*, 493 U.S. at 105, 110 S.Ct. 444 (stating that "[w]e have repeatedly held that the coverage of § 1983 must be broadly construed.")

The Third Circuit, applying *Blessing*, has explained the two conditions which are sufficient to rebut this presumption: "[t]he presumption is rebutted 'if Congress specifically foreclosed a remedy under § 1983, [either] expressly, by forbidding recourse to § 1983 in the statute itself, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983." *Powell*, 189 F.3d at 401 (citations omitted). If Congress has expressly prohibited the use of § 1983 to enforce the right plaintiffs have identified, plaintiffs' § 1983 claim must fail. Otherwise, the burden is upon the defendant, to "make the difficult showing that allowing a § 1983 action to go forward in these circumstances 'would be inconsistent with Congress' carefully tailored scheme.'" *Id. See also West Va. Univ. Hosp., Inc. v. Casey*, 885 F.2d 11, 18 n. 1 (3d Cir.1989)(explaining that "[u]nder § 1983 analysis, on the other hand, once a federal right is established, the existence of a remedy is presumed because § 1983 itself provides the authorization for private enforcement.")

Based upon the Supreme Court's holding in *Blessing*, the inquiry now before this Court is whether, applying the three-factor test the Supreme Court articulated in *Blessing*, Plaintiffs in this case can demonstrate that § 602, and specifically, the implementing regulations promulgated by the EPA thereunder, give rise to a federal right enforceable under § 1983. If this Court finds that there is such a right, then the burden shifts to the NJDEP and SLC to show that the remedial scheme envisioned by Title VI's implementing regulations is so comprehensive as to foreclose the enforcement of that right under § 1983.

### 3. The Differences Between the *Cort v. Ash* Implied Right of Action Test and the *Blessing v. Freestone* § 1983 Test

As the Supreme Court has observed, the inquiry whether an action may be brought under § 1983 is separate and distinct from the inquiry courts must perform to determine whether Congress intended that a statute create an implied private right of action, which is the inquiry the Supreme Court undertook in *Sandoval. See Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 508 n. 9, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990). To discern whether an implied right of action exists under a particular statute, courts employ the four-factor test articulated by the Supreme Court in *Cort v. Ash*, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). In *Cannon v. Univ. of Chicago*, 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979), the Court explained:

> In determining whether a private remedy is implicit in a statute not expressly providing one, several factors are relevant. First, is the plaintiff "one of the class for whose especial benefit the statute was enacted," that is, does that statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purpose of the legislative scheme to imply such a remedy for the plaintiffs? And finally, is the cause of action one traditionally relegated to

state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Cannon,* 441 U.S. at 689 n. 9, 99 S.Ct. 1946 (citations omitted). The *Cort* test "reflects a concern, grounded in separation of powers, that Congress rather than the courts control the availability of remedies for violations of statutes." *Wilder,* 496 U.S. at 509 n. 9, 110 S.Ct. 2510. While the *Cort* test, like the *Blessing* test, considers whether the provision was enacted for the benefit of the putative plaintiff, the central inquiry of the *Cort* test is the second prong of that test, specifically, "whether Congress intended to create, either expressly or by implication, a private cause of action." *Touche Ross & Co. v. Redington,* 442 U.S. 560, 575, 99 S.Ct. 2479, 61 L.Ed.2d 82 (1979); *accord Suter v. Artist M,* 503 U.S. 347, 363, 112 S.Ct. 1360, 118 L.Ed.2d 1 (stating that the *Cort* decision places the burden on the plaintiff to demonstrate Congress's intent to make a private remedy available); *Nat'l Sea Clammers Assoc.,* 453 U.S. at 11–13, 101 S.Ct. 2615 (stating that the "key to the inquiry" is whether Congress intended to create a private right of action); *Transamerica Mortgage Advisors Inc. v. Lewis,* 444 U.S. 11, 15–16, 100 S.Ct. 242, 62 L.Ed.2d 146 (1979) (describing that "what must ultimately be determined is whether Congress intended to create the private remedy asserted....").

In contrast, the three-part inquiry described in *Blessing, supra,* utilized to determine whether a plaintiff may assert a claim for the same rights under § 1983, is concerned with whether the statute creates a federal *right* in favor of the plaintiff. Whether the statute provides a *remedy* is of less concern because § 1983 itself provides the remedy. As the Supreme Court explained in *Wilder:*

> [The § 1983 inquiry] turns on whether the provision in question was intended to benefit the putative plaintiffs. If so, the provision creates an enforceable right unless it reflects merely a congressional preference for a certain kind of conduct rather than a binding obligation on the governmental unit, or unless the interest the plaintiff asserts is too vague and amorphous such that it is beyond the competence of the judiciary to enforce.

*Wilder,* 496 U.S. at 509, 110 S.Ct. 2510 (citations and internal quotations omitted). Section 1983 explicitly authorizes a private right of action, thereby obviating the need, in cases brought under § 1983, for courts to scrutinize the underlying statute giving rise to the claim to determine whether plaintiffs have a private right of action under that statute itself. The Supreme Court has explained the rationale for the distinction between these two types of inquiries as follows:

> In implied right of action cases, we employ the four factor *Cort* test to determine 'whether Congress intended to create the private remedy asserted' for the violation of statutory rights. The test reflects a concern, grounded in separation of powers, that Congress rather than the courts controls the availability of remedies for violations of statutes. Because § 1983 provides an "alternative source of express congressional authorization of private suits," these separation-of-powers concerns are not present in a § 1983 case. Consistent with this view, we recognize an exception to the general rule that § 1983 provides a remedy for violation of federal statutory rights only when Congress has affirmatively withdrawn the remedy.

*Wilder,* 496 U.S. at 508 n. 9, 110 S.Ct. 2510 (citations omitted).

The Third Circuit explained the difference between the two types of analysis as follows:

> For the sake of clarity, we briefly explain the difference between a § 1983 private right of action analysis and the general implied right of action analysis of *Cort v. Ash*. When a statute does not explicitly supply a private right of action, two occasionally intersecting avenues may be explored for a possible private right of enforcement ... under *Cort v. Ash*, the plaintiff bears the burden of establishing not only the existence of a right, but also the existence of an implied private remedy.... The § 1983 analysis intersects with the *Cort v. Ash* analysis insofar as the plaintiff under both analyses must establish the creation of a federal right. With respect to the existence of a remedy, however, the contrast between the two is stark. Under *Cort v. Ash* the plaintiff must establish that Congress intended the remedy. Under § 1983 analysis, on the other hand, once a federal right is established, the existence of a remedy is presumed because § 1983 itself provides the authorization for private enforcement. The burden is on the defendant to foreclose private enforcement.

*West Va. Univ. Hosp. v. Casey*, 885 F.2d at 18 n. 1. Other courts which have considered this issue have reached similar conclusions. For example, in *Samuels v. District of Columbia*, 770 F.2d 184 (D.C.Cir. 1985), the District of Columbia Court of Appeals explained:

> The *Thiboutot* decision thus allows private parties to enforce federal laws against a special class of defendants—state and municipal actors—in much the same way that implied rights of action permit private enforcement of federal statutory obligations against any party, public or private. As courts have recognized, however, statutory section 1983 claims differ significantly from implied private rights of action. In order to establish an implied private right of action under a federal statute, a plaintiff bears a relatively heavy burden of demonstrating that Congress affirmatively or specifically contemplated private enforcement when it passed the relevant statute. *See, e.g. Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 377–78, 102 S.Ct. 1825, 72 L.Ed.2d 182, (1982); *Cannon v. University of Chicago*, 441 U.S. 677, 688, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979); *Cort v. Ash* 422 U.S. 66, 78, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). Section 1983, however, itself creates an *express* federal cause of action against state officials for violations of federal law, and section 1983 plaintiffs do not suffer the burden of demonstrating that Congress specifically intended to preserve the ability of private parties to enforce the relevant provisions of federal law against those officials. *See Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 21 n. 31, 101 S.Ct. 2615, 69 L.Ed.2d 435,(1981) ("[W]e do not suggest that the burden is on a plaintiff to demonstrate congressional intent to preserve § 1983 remedies."). Instead, Congress is, in effect, presumed to legislate against the background of section 1983 and thus to contemplate private enforcement of the relevant statute against state and municipal actors absent fairly discernible congressional intent to the contrary. *See, e.g., Keaukaha–Panaewa Community Ass'n v. Hawaiian Homes Comm.*, 739 F.2d 1467, 1470–71 (9th Cir.1984).

*Samuels*, 770 F.2d at 194; *see also Dumas v. Kipp*, 90 F.3d 386, 391 (9th Cir.1996) (observing that though there is a connection between the *Cort* test and the § 1983 test, they are distinct). As I have already

noted, the Supreme Court's holding in *Sandoval* is limited to its determination that § 602 does not provide a private right of action to enforce the disparate impact regulations promulgated under § 602. For the purposes of the majority Opinion, however, Justice Scalia assumed the validity the regulations. *See Sandoval,* —— U.S. ——, ——–——, 121 S.Ct. 1511, 1519–1520, 149 L.Ed.2d 517.

■ The difference between these two lines of judicial inquiry explains why courts may find that a statute which does not contain an implied private right of action nonetheless creates rights which are enforceable through § 1983. *See Santiago v. Hernandez,* 53 F.Supp.2d 264, 268 (E.D.N.Y.1999)(explaining that "[i]t is conceptually possible for a plaintiff who is the intended beneficiary of a statute to have a § 1983 action but not a private right of action, or vice versa, because the remaining *Blessing* or *Cort* factors may not be satisfied in a plaintiff's favor.") For example, in *Fay v. South Colonie Cent. School District,* 802 F.2d 21, 33 (2d Cir.1986), the Second Circuit held that although the Family Educational Rights and Privacy Act ("FERPA"), 20 U.S.C. § 1232g, itself does not give rise to a private cause of action, plaintiffs could nonetheless bring suit under § 1983 to enforce rights created by FERPA.[5] Similarly, the Second Circuit held, in *Chan v. City of New York,* 1 F.3d 96 (2d Cir.1993), based on the *Cort*

analysis, that the Housing and Community Development Act did not create a private right of action, but did, based on the *Blessing/Wilder* analysis, create substantive rights which could be enforced through a § 1983 action. *Chan,* 1 F.3d at 102–106. (holding that laborers under municipal contract did not have private right of action under statute and implementing regulations which mandated that public contractors pay laborers 'prevailing wages,' but did have right to such wages under the statute and could enforce this right through § 1983). *See also Mallett v. Wisconsin Div. of Vocational Rehab.,* 130 F.3d 1245, 1248–57 (7th Cir.1997) (determining that a plaintiff could bring § 1983 claim based on the Rehabilitation Act because it created an enforceable right and did not foreclose such relief, but that there was no private right of action under the act because its language and legislative history suggested that the statute's administrative remedy was a more appropriate enforcement mechanism); *Keaukaha-Panaewa Comm. Ass'n v. Hawaiian Homes Comm'n,* 739 F.2d 1467, 1470–71 (9th Cir. 1984) (concluding that plaintiffs could bring § 1983 action because the statute at issue clearly mandated that the trust at issue be established for benefit of Hawaiians such as plaintiffs and did not foreclose § 1983 remedy, but also concluding that no private right of action existed under the statute); *Roman v. Morace,* No. 97–CV–341, 1997 WL 777844, at \* 3–13 (S.D.N.Y.

---

5.  *See also, Tarka v. Franklin,* 891 F.2d 102 (5th Cir.1989), *cert. denied,* 494 U.S. 1080, 110 S.Ct. 1809, 108 L.Ed.2d 940 (1990)(holding that "an action under 42 U.S.C. § 1983 may nevertheless be premised on an alleged violation of FERPA rights"); *Achman v. Chisago Lakes Indep. Sch. Dist.,* 45 F.Supp.2d 664, 674 (D.Minn.1999) (holding that FERPA "creates a federal right that is enforceable through section 1983 actions"); *Maynard v. Greater Hoyt Sch. Dist.,* 876 F.Supp. 1104, 1107 (D.S.D.1995) (stating that "FERPA does establish mandatory and direct obligations re-

garding educational records on school districts that receive federal funds"); *Belanger v. Nashua, New Hampshire, School Dist.,* 856 F.Supp. 40, 46 (D.N.H.1994) (explaining that "[t]he language of FERPA reveals a congressional intent to impose obligations directly on educational agencies or institutions"); *Krebs v. Rutgers,* 797 F.Supp. 1246, 1256 (D.N.J.1992)(stating that FERPA creates civil rights enforceable under §§ 1983); *Francois v. University of District of Columbia,* 788 F.Supp. 31, 32 (D.D.C.1992) (noting that FERPA "creates a federal right").

Dec. 16, 1997) (determining that plaintiffs could bring a § 1983 action as the intended beneficiaries of statutes, but could not sue directly under statutes).

### D. Application of the § 1983 Analysis to this Case

### 1. The Plaintiffs' Claim: The EPA's Implementing Regulations Promulgated Under § 602 Create a Federal Right to be Free of Adverse Disparate Impact Discrimination By Recipients of Federal Funds Pursuant to Title VI

Plaintiffs' § 1983 claim is grounded on the premise that the EPA's implementing regulations, promulgated under § 602, create a federal right to be free of adverse disparate impact discrimination by recipients of federal funds pursuant to Title VI. *See* Amd. Compl. at Second Count, ¶¶ 102–107. Because the existence of such a right turns on this Court's analysis of the regulations upon which Plaintiffs base their § 1983 claim, I shall set forth the relevant portions of EPA's § 602 implementing regulations in their entirety:

§ 7.30 General prohibition.

No person shall be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving EPA assistance on the basis of race, color, national origin, or on the basis of sex in any program or activity receiving EPA assistance under the Federal Water Pollution Control Act, as amended, including the Environmental Financing Act of 1972.

§ 7.35 Specific prohibitions.

(a) As to any program or activity receiving EPA assistance, a recipient shall not directly or through contractual, licensing, or other arrangements on the basis of race, color, national origin or, if applicable, sex:

(1) Deny a person any service, aid or other benefit of the program;

(2) Provide a person any service, aid or other benefit that is different, or is provided differently from that provided to others under the program;

(3) Restrict a person in any way in the enjoyment of any advantage or privilege enjoyed by others receiving any service, aid, or benefit provided by the program;

(4) Subject a person to segregation in any manner or separate treatment in any way related to receiving services or benefits under the program;

(5) Deny a person or any group of persons the opportunity to participate as members of any planning or advisory body which is an integral part of the program, such as a local sanitation board or sewer authority;

(6) Discriminate in employment on the basis of sex in any program subject to Section 13, or on the basis of race, color, or national origin in any program whose purpose is to create employment; or, by means of employment discrimination, deny intended beneficiaries the benefits of the EPA assistance program, or subject the beneficiaries to prohibited discrimination.

(7) In administering a program or activity receiving Federal financial assistance in which the recipient has previously discriminated on the basis of race, color, sex, or national origin, the recipient shall take affirmative action to provide remedies to those who have been injured by the discrimination.

(b) A recipient shall not use criteria or methods of administering its program which have the effect of subjecting individuals to discrimination because of their race, color, national origin, or sex, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program with respect to individuals of a particular race, color, national origin, or sex.

(c) A recipient shall not choose a site or location of a facility that has the purpose or effect of excluding individuals from, denying them the benefits of, or subjecting them to discrimination under any program to which this Part applies on the grounds of race, color, or national origin or sex; or with the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of this subpart.

(d) The specific prohibitions of discrimination enumerated above do not limit the general prohibition of §§ 7.30.

### 2. The Elements of a § 1983 Claim

To pursue a § 1983 suit alleging disparate impact discrimination in violation of the EPA's § 602 implementing regulations, Plaintiffs must first demonstrate, as a threshold matter, that their claim falls within the ambit of § 1983. Section 1983 limits liability to any person who, under color of state law, subjects any citizen of the United States to a deprivation of any rights, privileges, or immunities secured by the Constitution and laws. 42 U.S.C. § 1983.

■ Plaintiffs contend that Defendant, NJDEP Commissioner Robert Shinn, is a "person" within the meaning of § 1983 such that Plaintiffs have the right to bring suit against him under § 1983. In *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989), the Supreme Court held that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983," and that therefore, such defendants are immune from suit under § 1983. *Will,* 491 U.S. at 71, 109 S.Ct. 2304. While this holding appears at first blush to be fatal to Plaintiffs' case, the Supreme Court recognized an exception to its holding in *Will:* "Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the State.'" *Id.* at n. 10, 109 S.Ct. 2304 (citing, *inter alia, Ex Parte Young,* 209 U.S. 123, 159–60, 28 S.Ct. 441, 52 L.Ed. 714 (1908)). Citing *Will,* the Third Circuit has explained this distinction as follows:

> When state officials are sued in their official capacities for damages, that suit is treated as one against the state and the official is not considered to be a "person." Hence, § 1983 cannot be invoked.... A suit for damages must be contrasted with a suit for equitable relief. The Supreme Court has held that a state official sued for injunctive relief is a "person" under § 1983, because an action for prospective relief is not treated as an action against the state.

*Powell,* 189 F.3d at 401. Under the Supreme Court's holding in *Will,* it is clear that Plaintiffs' claim against Commissioner Shinn, for prospective injunctive relief, falls within the ambit of § 1983.[6]

---

**6.** SLC argues that Plaintiffs cannot obtain the relief they seek, which SLC defines as the "retroactive revo[cation]" of the permits NJDEP issued to SLC on October 31, 2000, under § 1983, because "[u]nder the doctrine of *Ex Parte Young,* if a plaintiff sues a state

Second, § 1983 is limited to claims alleging the deprivation, under color of state law, of "any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Plaintiffs may only bring suit under § 1983 to enforce rights secured by the Constitution "and laws." In this case, Plaintiffs base their § 1983 claim now before this Court not on an alleged violation of the Constitution, but on the alleged violation of EPA's implementing regulations promulgated pursuant to Title VI, § 602.

The Supreme Court has held that the plain meaning of the phrase "and laws" in § 1983 authorizes plaintiffs to bring § 1983 claims based on alleged violations of federal statutes. *Maine v. Thiboutot*, 448 U.S. 1, 4, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980). The Court has, however, limited the prospective reach of its holding in *Thiboutot* by emphasizing, in subsequent decisions construing that case, that § 1983 may only be invoked to assert a violation of a federal *right*, not merely a violation of federal *law*. *See Golden State Transit Corp.*, 493 U.S. at 106, 110 S.Ct. 444; *Blessing*, 520 U.S. at 340, 117 S.Ct. 1353. The Court developed the analysis articulated in *Blessing, infra*, as a means of distinguishing those statutes which create rights within the meaning of § 1983 from those which merely provide guidance or state policy preferences.

■ In this case, Plaintiffs contend that the EPA's implementing regulations, promulgated pursuant to § 602 of Title VI, create "rights," within the meaning of § 1983. As a threshold question, before I can address whether Plaintiffs are correct in their assertion that these particular reg-

ulations create such "rights," I must first consider Plaintiffs' contention, that, as a general proposition, agency regulations may create "rights" within the meaning of § 1983. *See* Pls.' Suppl. Br. at 3.

The Supreme Court has answered this question in the affirmative. In *Wright v. City of Roanoke*, 479 U.S. 418, 107 S.Ct. 766, 93 L.Ed.2d 781 (1987), the Court considered whether tenants living in low-income housing units could bring a § 1983 action against the City of Roanoke Redevelopment and Housing Authority, based on their allegation that the defendant, by over-billing them, had violated the Brooke Amendment to the Housing Act of 1937 and implementing regulations promulgated by the Department of Housing and Urban Development ("HUD"). *Wright*, 479 U.S. at 419, 107 S.Ct. 766. The Brooke Amendment imposed a ceiling for rents charged to low-income tenants living in public housing projects. *See* 42 U.S.C. § 1437a. HUD regulations promulgated pursuant to the Brooke Amendment provided that the rent to be charged to tenants in public housing would include a "reasonable amount" for the use of utilities, such that the aggregate total paid by a family would not exceed one-fourth (subsequently raised to 30%) of that family's income. *See* Interim Rule, 45 Fed.Reg. 59502 (September 9, 1980); 24 C.F.R. § 865.470 *et seq.* Plaintiffs alleged that the City Housing Authority had overcharged them for utilities because it failed to comply with HUD regulations, which entitled plaintiffs to the inclusion of "reasonable" utility services within their prescribed maximum rental payment. *Wright*, 479 U.S. at 423, 107 S.Ct. 766. In response, the Roanoke

---

official alleging a violation of federal law, the federal court may award an injunction that governs the official's future conduct; but the Eleventh Amendment bars retrospective relief." SLC Suppl. Br. at 35 (citations omit-

ted). I shall consider SLC's argument regarding the relief available to plaintiffs under § 1983 after I determine whether plaintiffs have demonstrated the existence of a federal right under the *Blessing* analysis.

Housing Authority "assert[ed] that neither the Brooke Amendment nor the HUD interim regulations gave tenants any specific or definable rights to utilities, that is, no enforceable rights within the meaning of § 1983." *Id.* at 429, 107 S.Ct. 766.

The Supreme Court rejected the Housing Authority's argument based, in part, on its conclusion that the HUD regulations, promulgated to enforce the Brooke Amendment, created a right, enforceable via § 1983, to have a reasonable amount of utilities included in rent that the public housing authority was authorized to charge. *Id.* at 430, 107 S.Ct. 766. The Court held that "HUD's view is entitled to deference as a valid interpretation of the statute, and Congress in the course of amending that provision has not disagreed with it." *Id; see also id.* at 427, 107 S.Ct. 766 (stating that "HUD's opinion as to the available tenant remedies under the Housing Act is entitled to some deference by this Court," and citing *Chevron U.S.A. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984)).

The Court concluded that the intent of the Brooke Amendment to benefit plaintiffs was "undeniable," and that the HUD regulations interpreting that Amendment set out specific guidelines had "the force of law." *Id.* at 431, 107 S.Ct. 766 (citing *Chrysler Corp. v. Brown,* 441 U.S. 281, 294–95, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979)). Furthermore, the Court held that the regulations created rights enforceable under § 1983 because they conferred benefits on tenants, which were "sufficiently specific to qualify as enforceable rights under *Pennhurst* and § 1983," and were not beyond the competence of the judiciary to enforce. *Wright,* 479 U.S. at 432, 107 S.Ct. 766. This is the exact test which the Supreme Court, citing *Wright,* recently applied in *Blessing* to determine whether a

statute creates enforceable rights under § 1983. *See Blessing,* 520 U.S. at 341, 117 S.Ct. 1353.

The Third Circuit, applying *Wright,* has held that "with respect to the private rights requirement [of § 1983 analysis], valid federal regulations as well as federal statutes may create rights enforceable under § 1983." *West Va. Univ. Hosp. v. Casey,* 885 F.2d at 18. In that case, the Third Circuit held that a hospital located six miles from the Pennsylvania border, in West Virginia, could pursue a § 1983 action against Pennsylvania officials charged with administering Pennsylvania's Medicaid program, alleging that their refusal to reimburse the hospital for the costs of treating Pennsylvania Medicaid recipients violated Title XIX of the Social Security Act and regulations promulgated thereunder. *Id.* at 22–25. Similarly, in *Alexander v. Polk,* 750 F.2d 250 (3d Cir.1984), the Third Circuit held that federal regulations governing the administration of the federal Supplemental Food Program for Women, Infants, and Children ("WIC") program created rights enforceable under § 1983 for recipients of WIC assistance.

Other Courts of Appeal have likewise concluded that federal regulations can form the basis for a § 1983 action. *See, e.g., Loschiavo v. City of Dearborn,* 33 F.3d 548, 551 (6th Cir.1994)(holding that regulation promulgated by Federal Communications Commission created right which plaintiff could enforce via § 1983 suit against the City of Dearborn); *Buckley v. City of Redding, California,* 66 F.3d 188, 190 (9th Cir.1995)(holding that regulations promulgated pursuant to Federal Aid in Sport Fish Restoration Act created right for the purpose of § 1983).

The fact that federal regulations may have the force of law has been confirmed by the Supreme Court in other contexts. In *Chrysler Corp. v. Brown,* 441 U.S. 281,

99 S.Ct. 1705, 60 L.Ed.2d 208 (1979), the Supreme Court held that regulations have the "force and effect of law" if they: (1) are substantive, meaning they function as a "legislative-type rule" which affects individual rights and obligations; (2) Congress granted the agency which issued the regulations the authority to promulgate such regulations; (3) the regulations were promulgated in accordance with any procedural requirements imposed by Congress, *e.g.*, the Administrative Procedure Act. *Chrysler*, 441 U.S. at 301–03, 99 S.Ct. 1705. The *Chrysler* test is regularly applied by federal courts to determine whether a particular regulation has the "force and effect of law." *See, e.g., U.S. v. New Holland Sales Stables, Inc.*, 800 F.2d 1232, 1238 (3d Cir. 1986) (applying *Chrysler* to determine whether Farmers Home Administration regulation had "force or effect" of law); *U.S. v. Mitchell*, 39 F.3d 465 (4th Cir.1994) (applying *Chrysler* to determine whether Customs Service, United States Fish and Wildlife Department, and Department of Agriculture regulations had "force and effect of law"); *Brown v. United States*, 227 F.3d 295, 298 (5th Cir.2000) (applying *Chrysler* to determine whether EEOC regulation had "force and effect of law"); *Morgan v. Markerdowne Corp.*, 976 F.Supp. 301, 313 (D.N.J.1997) (Debevoise, J.)(applying *Chrysler* to determine that regulations promulgated by the Department of Education, pursuant to Higher Education Act of 1965, provided legally enforceable basis for student borrower to assert school-related defenses against lenders and assignees as to school-originated loans).

The *Chrysler* inquiry has been used in the context of determining whether regulations may create rights which are enforceable under § 1983. For example, the Supreme Court cited *Chrysler* to support its conclusion, in *Wright,* that the HUD regulations at issue in that case created a "right" within the context of § 1983. *Wright,* 479 U.S. at 431, 107 S.Ct. 766. Similarly, in *Samuels v. District of Columbia,* 770 F.2d 184 (D.C.Cir.1985), the District of Columbia Court of Appeals found that plaintiffs' allegations, that the District of Columbia public housing authority had violated the Department of Housing and Urban Development's ("HUD") implementing regulations to the Housing Act, by failing to provide a grievance proceeding as mandated by regulations, *alone* stated a cognizable § 1983 claim. *Id.* at 199 (citing 24 C.F.R. §§ 966.51(a), 966.53 and 42 U.S.C. § 1437 *et seq.*). As the District of Columbia Court of Appeals explained:

> HUD's grievance procedure regulations clearly have the full force and effect of law: they are issued under a congressional directive to implement specific statutory norms and they affect individual rights and obligations. While *Thiboutot* involved a statutory violation, the Court's broad analysis of the 'laws' clause of section 1983 indicates that section 1983 provides a legal remedy for the violation of all valid federal laws, including at least those federal regulations adopted pursuant to a clear congressional mandate that have the full force and effect of law. Such regulations have long been recognized as part of the body of federal law, and *Thiboutot* expressly held that Congress did not intended to limit section 1983 to some subset of federal laws.

*Samuels,* 770 F.2d at 199. *See also DeVargas v. Mason & Hanger-Silas Mason Co.,* 844 F.2d 714, 724 n. 19 (10th Cir.1988) (stating that "[i]n at least some instances, violations of rights provided under federal regulations provide a basis for § 1983 suits." (citations omitted)).

Applying the *Chrysler* inquiry to the regulations at issue in this case, I conclude that the EPA's § 602 regulations satisfy

the *Chrysler* criteria, and therefore have the "force and effect of law." The regulations, insofar as they explicitly prohibit recipients of federal funding from using "criteria or methods of administering [their] programs which have the effect" of subjecting individuals to discrimination, create obligations which directly affect individuals. 40 C.F.R. § 7.35(b). Furthermore, Congress granted the agency which issued the regulations not merely the authority to promulgate such regulations, but a directive to do so, in the plain language of § 602:

> Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is *authorized and directed* to effectuate the provisions of section 2000d of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability....

42 U.S.C. § 2000d–1 (emphasis added). It is undisputed that the implementing regulations were promulgated in accordance with all procedural requirements imposed by Congress. Finally, I note again that, in the *Sandoval* decision, the Court assumed the validity of identical regulations promulgated by the Department of Justice and the Department of Transportation. *Sandoval*, ─── U.S. ───, ───, 121 S.Ct. 1511, 1517, 149 L.Ed.2d 517, 2001 WL 408983 at *4 (stating that "[w]e therefore assume for the purposes of deciding this case that the DOJ and DOT regulations proscribing activities that have a disparate impact on the basis of race are valid.")

█ Thus, I conclude, based upon the Supreme Court's holding in *Wright*, as well as the holdings of the District of Columbia Circuit in *Samuels*, the Sixth Circuit in *Loschiavo* and the Ninth Circuit

in *Buckley*, governing Third Circuit precedent, specifically, *Alexander v. Polk* and *W. Va. Univ. Hosp.*, and my application of the *Chrysler* test, that valid federal regulations, which have the "force and effect of law," may create rights which are enforceable under § 1983. *See Wright*, 479 U.S. at 430–32, 107 S.Ct. 766; *Loschiavo*, 33 F.3d at 550–53; *Buckley*, 66 F.3d at 190; *Alexander v. Polk*, 750 F.2d at 259–60; *W. Va. Univ. Hosp.*, 885 F.2d at 18. I further conclude that the appropriate test for discerning whether a federal regulation does in fact create a "right" within the meaning of § 1983 is through the application of the three-part test first articulated in *Wright* and most recently reaffirmed by the Supreme Court in *Blessing*. *See Wright*, 479 U.S. at 430–32, 107 S.Ct. 766; *Blessing*, 520 U.S. at 340, 117 S.Ct. 1353. Accordingly, I shall proceed to analyze Plaintiffs' claim by applying the three-part *Blessing* test.

### 3. A History of the Implementing Regulations Promulgated by Federal Agencies Pursuant to § 602 of Title VI

The inquiry I must now undertake is whether the EPA's Title VI implementing regulations, codified at 40 C.F.R. § 7.1 *et seq.*, create rights enforceable under § 1983. As I have explained, the Supreme Court articulated a three-part test, first in *Wright*, which it refined in *Wilder*, and most recently restated in *Blessing*, for determining whether a particular statutory or regulatory provision creates a "right" which is enforceable under § 1983. This Court must decide whether the EPA's implementing regulations were intended to benefit the putative plaintiff, whether the right allegedly created is enforceable by the judiciary, and whether the provision allegedly creating the right is couched in mandatory or merely precatory terms.

To the extent that the EPA's implementing regulations to Title VI do not exist in isolation, but rather, were enacted as part of a comprehensive multi-agency response to Congress's directive, expressed in § 602, requiring federal agencies to effectuate the anti-discrimination mandate of § 601, I shall first consider the questions raised in the *Blessing* test in the context of the effort by federal agencies to implement Title VI pursuant to § 602.

Title VI was enacted as part of the comprehensive Civil Rights Act of 1964. The other subchapters of the Civil Rights Act prohibit discrimination in Public Accommodation (Title II, 42 U.S.C. § 2000a *et seq.*), Public Facilities (Title III, 42 U.S.C. § 2000b *et seq.*), Public Education (Title IV, 42 U.S.C. § 2000c *et seq.*), and Employment (Title VII, 42 U.S.C. § 2000e *et seq.*)

It is axiomatic that Congress's purpose in enacting the Civil Rights Act of 1964 was to prohibit discrimination against individuals on the basis of race, color, or national origin. The specific purpose of Title VI was explained as follows by Representative Cellar, the Chairman of the House Judiciary Committee, when he introduced Title VI:

> Simple justice requires that public funds, to which all taxpayers of all races contribute, not be spent in any fashion which encourages, entrenches, subsidizes, or results in racial discrimination. Direct discrimination by Federal, State, or local governments is prohibited by the Constitution. But indirect discrimination, through the use of federal funds, is just as invidious.

109 Cong. Rec. 11161 (1963). After reviewing the legislative history of Title VI, Justice Brennan, writing for a plurality of the Supreme Court which concurred in the judgment in *Regents of Univ. California v. Bakke*, 438 U.S. 265, 335, 98 S.Ct. 2733, 57 L.Ed.2d 750 (1978) (Brennan, White, Marshall, and Blackmun, JJ., concurring in judgment in part and dissenting) explained that "[t]he conclusion to be drawn from the [legislative history of Title VI] is clear. Congress recognized that Negroes, in some cases with Congressional acquiescence, were being discriminated against in the administration of programs and denied the full benefits of activities receiving federal financial support," and enacted Title VI to give the Executive Branch the authority to end the Government's complicity in this discrimination. *Bakke*, 438 U.S. at 335, 98 S.Ct. 2733.

Significantly, Congress, in enacting Title VI, did not define "discrimination," nor does § 602 contain an explanation of what constitutes "discrimination." Rather, as Justice Brennan explained, "[t]he legislative history shows that Congress specifically eschewed any static definition of discrimination in favor of broad language that could be shaped by experience, administrative necessity, and evolving judicial doctrine." *Bakke*, 438 U.S. at 337, 98 S.Ct. 2733.[7] For example, Attorney General

---

7. *See also Guardians,* where Justice Marshall explained:

> The legislative history of Title VI fully confirms that Congress intended to delegate to the Executive Branch substantial leeway in interpreting the meaning of "discrimination" under Title VI. The word "discrimination" was nowhere defined in Title VI. Instead, Congress authorized executive departments and agencies to adopt regula-

tions with the anti-discrimination principle of §§ 601 of the Act "as a general criterion to follow." Civil Rights: Hearings on H.R. 7152 Before the House Comm. on the Judiciary, 88th Cong., 1st Sess. 2740 (1963) (testimony of Attorney General Kennedy). Congress willingly conceded "[g]reat powers" to the executive branch in defining the reach of the statute. *Id.,* at 1520 (state-

Robert Kennedy testified that the regulations were not written into the legislation because "there are so many different programs . . . to try to write out something specifically in the legislation as to what should be done, and what rules and regulations would be issued is virtually impossible." Civil Rights: Hearings before Subcomm. No. 5 of the House Comm. on the Judiciary, 88th Cong., 1st Sess. 2703 (testimony of Atty. Gen. Kennedy).

Congress chose to delegate this duty to the federal agencies. Justice Marshall, in reviewing the legislative history of Title VI in *Guardians,* explained the intent of Congress and the evolution of Title VI and the § 602 implementing regulations as follows:

> Shortly after the enactment of Title VI, a presidential task force produced model Title VI enforcement regulations specifying that recipients of federal funds not use "criteria or methods of administration which have the effect of subjecting individuals to discrimination." 45 C.F.R. §§ 80.3(b)(2) (1964). The Justice Department, which had helped draft the language of Title VI, participated heavily in preparing the regulations. Seven

federal agencies and departments carrying out the mandate of Title VI soon promulgated regulations that applied a disparate impact or "effects" test. *See* 29 Fed.Reg. 16274–16305 (1964).

\*     \*     \*     \*     \*     \*

> Following the initial promulgation of regulations adopting an impact standard, every Cabinet department and about forty federal agencies adopted standards interpreting Title VI to bar programs with a discriminatory impact. The statute has been uniformly and consistently so construed by the agencies responsible for its enforcement for nearly two decades.

*Guardians,* 463 U.S. at 618, 103 S.Ct. 3221 (Marshall, J., dissenting). In sum, federal agencies, acting pursuant to Congress's mandate, explicit in the language of § 602, that "each federal agency is . . . authorized and directed to" promulgate regulations, have uniformly promulgated regulations which prohibit disparate impact discrimination.[8]

The overwhelmingly uniform and consistent response of federal agencies to Title

---

ment of Rep. Cellar, Chairman of the House Judiciary Committee). 463 U.S. at 622–23, 103 S.Ct. 3221 (Marshall, J. dissenting).

**8.** *See, e.g.:*
5 C.F.R. §§ 900.404(b)(2) (Office of Personnel Management);
7 C.F.R. §§ 15.3(b)(2) (Dep't of Agric.);
7 C.F.R. §§ 1901.202(a)(2)(vii) (Dep't of Agric.);
10 C.F.R. §§ 4.12(b) (Nuclear Regulatory Comm'n);
10 C.F.R. §§ 1040.13(c),(d) (Dep't of Energy);
14 C.F.R. §§ 1250.103–2(b) (NASA);
15 C.F.R. §§ 8.4(b)(viii)(2) (Dep't of Commerce);
18 C.F.R. §§ 705.4(b)(2) (Water Resources Council);
18 C.F.R. §§ 1302.4(b)(2),(3) (Tenn. Valley Auth.);

22 C.F.R. §§ 141.3(b)(2) (State Dep't);
22 C.F.R. §§ 209.4(b)(2),(3) (Agency for Int'l Dev.);
24 C.F.R. §§ 1.4(b)(2),(i)(3)(Dep't of Housing & Urban Dev.);
28 C.F.R. §§ 42.104.(b)(2), (3) (Justice Dep't);
29 C.F.R. §§ 31.3(b)(2),(3) (Dep't of Labor);
32 C.F.R. §§ 195.4(b)(2) (Dep't of Defense);
34 C.F.R. §§ 100.3(b)(2) (Dep't of Education)
38 C.F.R. §§ 18.3(b)(2) (Dep't of Veterans Affairs);
45 C.F.R. §§ 80.3(b)(2) (Dep't of Health & Human Servs.);
45 C.F.R. §§ 611.3(b)(2) (Nat'l Science Found.);
45 C.F.R. §§ 1203.4(b)(2)(Corp. for Nat'l & Community Serv.);
49 C.F.R. §§ 21.5(b)(2) (Dep't of Transportation).

VI supports the conclusion that both sections of Title VI impose affirmative duties on federal agencies and funding recipients. Section 601, which provides that "no person *shall*" be discriminated against in the provision of federally-funded services, expresses a Congressional mandate, not merely a "preference" or policy guidance. Section 602 "authorizes and directs" each federal agency to implement the mandate contained in Section 601.

Finally, Congress, although it has amended the Civil Rights Act numerous times since its original enactment in 1964, has never acted to correct, reverse, or otherwise change this consistent interpretation of Congress's intent in enacting § 602. *See Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 381–82, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982) (Court inferred congressional intent to ratify lower court decisions regarding a particular statutory provision when Congress revised a statutory scheme without amending the provision in question).[9]

In contrast to the uniform interpretation of Title VI by federal agencies, the Supreme Court's Title VI jurisprudence has been described as "fractured." *Sandoval,* — U.S. —, —, , 121 S.Ct. 1511, 1526, 149 L.Ed.2d 517 (Stevens, J., dissenting). Indeed, as Justice Scalia stated in *Sandoval,* "[a]lthough Title VI has often come to this Court, it is fair to say (indeed, perhaps an understatement) that our opinions have not eliminated all uncertainty regarding its commands." *Sandoval,* — U.S. —, —, 121 S.Ct. 1511, 1515, 149 L.Ed.2d 517. Nevertheless, a close examination of Supreme Court precedent analyzing Title VI reveals the Court's unvarying assump-

tion, expressed most recently in *Sandoval,* that the implementing regulations promulgated pursuant to § 602 are valid.

An examination of the Title VI implementing regulations necessarily begins with the Supreme Court's opinion in *Guardians.* *Guardians* involved a suit brought by African American and Hispanic police officers against the City of New York, alleging that the City's practice of "last-hired, first-fired" violated Title VI. No opinion in that case commanded a majority. Five Justices, however, held that disparate impact regulations adopted by federal agencies under § 602 were valid interpretations of Title VI. *Guardians,* 463 U.S. at 593, 103 S.Ct. 3221 (White, J., concurring); *id.* at 623, 103 S.Ct. 3221 (Marshall, J., dissenting); and *id.* at 644–45, 103 S.Ct. 3221 (Stevens, Brennan, and Blackmun, JJ., dissenting).

This understanding of *Guardians* was corroborated by a unanimous Supreme Court in *Alexander v. Choate,* decided just a year and a half after *Guardians:*

> In *Guardians,* we confronted the question whether Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d *et seq.,* which prohibits discrimination against racial and ethnic minorities in programs receiving federal aid, reaches both intentional and disparate-impact discrimination. No opinion commanded a majority in Guardians, and Members of the Court offered widely varying interpretations of Title VI. Nevertheless, a two-pronged holding on the nature of discrimination proscribed by Title VI emerged in that case. First, the Court held that Title VI itself reached only instances of intentional discrimination. Second, the Court

---

9. *But cf. Sandoval,* — U.S. —, 121 S.Ct. 1511, 149 L.Ed.2d 517, 2001 WL 408983 at *10 (stating that the fact that Congress has not acted to reverse the numerous courts which had construed Title VI as providing an

implied private right of action did not indicate Congressional "ratification" of that interpretation because Congress has made only "isolated" amendments to Title VI.)

held that actions having an unjustifiable disparate impact on minorities could be redressed through agency regulations designed to implement the purposes of Title VI. *In essence, then, we held that Title VI had delegated to the agencies in the first instance the complex determination of what sorts of disparate impacts upon minorities constituted sufficiently significant social problems, and were readily enough remediable, to warrant altering the practices of the federal grantees that had produced those impacts.* *Alexander v. Choate,* 469 U.S. 287, 293–94, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985)(emphasis added).

Relying on the Supreme Court's affirmation, in *Alexander v. Choate,* of the five Justice coalition's holding in *Guardians,* that federal agencies may validly prohibit disparate impact discrimination pursuant to Title VI, many federal courts have assumed the validity of Title VI implementing regulations prohibiting disparate impact discrimination, and applied them in litigation involving a vast range of federally-funded activity. *See, e.g., Powell,* 189 F.3d at 396–400 (In action brought by minorities alleging that state's practices in funding public education had racially discriminatory effect, in violation of Department of Education's Title VI implementing regulations, 34 C.F.R. § 100.3(b)(2), the Third Circuit cited *Guardians* and applied disparate impact analysis based on regulations); *Latinos Unidos De Chelsea En Accion (LUCHA) v. HUD,* 799 F.2d 774 (1st Cir.1986) (In action brought by minorities alleging that defendants deprived minorities of equal opportunity in employment, housing and government contracts, in violation of Department of Housing's Title VI implementing regulations, 24 C.F.R. § 1.4(b)(2)(i), the First Circuit applied disparate impact analysis based on regulations); *New York Urban League v. State of New York,* 71 F.3d 1031, 1036 (2d Cir.1995) (In action brought by mass-transit users against the State of New York, alleging that state's allocation of funds for mass transit discriminated against minority users in violation of Department of Transportation's Title VI implementing regulations, 49 C.F.R. § 21.5(b)(2), the Second Circuit cited *Guardians* and *Alexander v. Choate* to support the proposition that Title VI delegated to federal agencies the authority to promulgate regulations incorporating a disparate impact standard); *Ferguson v. Charleston,* 186 F.3d 469 (4th Cir.1999), *rev'd on other grounds,* —— U.S. ——, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001)(In action brought by minority health services recipients, alleging that hospital's policy of testing pregnant women for cocaine disparately impacted African–American women in violation of Department of Health and Human Services' Title VI implementing regulations, 45 C.F.R. §§ 80.3(b)(2), the Fourth Circuit cited *Guardians* and *Alexander v. Choate* and applied disparate impact analysis); *Castaneda v. Pickard,* 781 F.2d 456, 465 n. 11 (5th Cir.1986) (In action brought by Mexican–American children and their parents, alleging that school district had discriminated against them in violation of Title VI, the Fifth Circuit cited *Guardians* and noted that "[t]he Supreme Court has [ ] held that proof of discriminatory intent is not required for a Title VI action for equitable relief … a Title VI action can now be maintained in either the guise of a disparate treatment case, where proof of discriminatory motive is crucial, or in the guise of a disparate impact case, involving employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly

on one group than another. In this latter type of case, proof of discriminatory intent is not necessary."); *Buchanan v. Bolivar*, 99 F.3d 1352, 1356 n. 5 (6th Cir.1996) (stating that "[a] plaintiff may pursue [a Title VI] claim under a disparate impact theory as well," citing *Guardians*, 463 U.S. 582, 103 S.Ct. 3221, 77 L.Ed.2d 866 (1983)). *David K. v. Lane*, 839 F.2d 1265, 1274 (7th Cir.1988) (In action brought by white inmates against prison, alleging that prison policy of allowing gang activity had discriminatory impact in violation of Department of Justice's Title VI disparate impact regulations, 28 C.F.R. § 42.104(b)(2), the Seventh Circuit cited *Guardians* to support the proposition that "plaintiffs need not show intentional discriminatory conduct to prevail on a claim brought under these administrative regulations. Evidence of discriminatory effect is sufficient."); *City of Chicago v. Lindley*, 66 F.3d 819, 827–29 (7th Cir.1995) (In action brought by City of Chicago against director of Department of Aging, alleging that funding distribution calculation had disparate impact on minorities in violation of Department of Health & Human Services Title VI implementing regulations, 45 C.F.R. §§ 80.3(b)(2), the Seventh Circuit applied disparate impact analysis based on *Guardians* and *Alexander v. Choate* ); *Larry P. v. Riles*, 793 F.2d 969, 982 (9th Cir. 1984) (In class action brought by minority children, alleging school district's use of IQ tests to place certain students in class for the educable mentally retarded had disparate impact on minority children in violation of Department of Health, Education and Welfare Title VI implementing regulations, the Ninth Circuit cited *Guardians* and stated that "given appellees' reliance on the [Title VI implementing] regulations, we find it appropriate to apply a discriminatory effect analysis."); *Villanueva v. Carere*, 85 F.3d 481, 486 (10th Cir.1996) (In action brought by Hispanic parents, alleging school district's decision to close neighborhood schools and open ne@w charter school constituted disparate impact discrimination in violation of Title VI implementing regulations, the Tenth Circuit cited *Guardians* and stated that "[a]lthough Title VI itself proscribes only intentional discrimination, certain regulations promulgated pursuant to Title VI prohibit actions that have a disparate impact on groups protected by the act, even in the absence of discriminatory intent".); *Elston v. Talladega Board of Educ.*, 997 F.2d 1394, 1406–07 (11th Cir.1993) (In action brought by class of African–American children and their parents, alleging that school's effort to restructure school system had discriminatory impact on children in violation of Department of Education's Title VI implementing regulations, the Eleventh Circuit applied disparate impact analysis and cited *Guardians* for the proposition that "[w]hile Title VI itself, like the Fourteenth Amendment, bars only intentional discrimination, the regulations promulgated pursuant to Title VI may validly proscribe actions having a disparate impact on groups protected by the statute, even if those actions are not intentionally discriminatory."); *Rodriguez v. California Highway Patrol*, 89 F.Supp.2d 1131, 1139 (N.D.Cal.2000) (In action brought by minority drivers pursuant to Department of Justice's Title VI implementing regulations, 28 C.F.R. § 42.104(b)(2), alleging that California Highway Patrol engaged in discriminatory racial profiling, the Northern District of California stated that "[section 601] requires proof of discriminatory intent; the regulations do not," and held that plaintiffs had stated a claim under the regulations).

The cases cited above represent a small number of those cases in which federal courts have considered disparate impact claims based on alleged violations of Title VI implementing regulations in the nearly twenty years since the Supreme Court's decisions in *Guardians* and *Alexander v. Choate.* The frequency with which federal courts have had occasion to review such claims, and the proficiency with which they have done so, leads this Court to conclude that the right(s) created by Title VI implementing regulations are not so "vague and amorphous" as to be unenforceable, but rather, are clearly within the competence of the judiciary to enforce. *See Blessing,* 520 U.S. at 340–41, 117 S.Ct. 1353.

Finally, I note that the Supreme Court's holdings, in *Guardians* and *Alexander v. Choate,* recognizing the validity of the Title VI implementing regulations prohibiting disparate impact discrimination, and the uniform application of these regulations in federal courts in nearly every Federal Circuit, are consistent with the deference courts must accord to validly enacted administrative regulations. As this Court recently explained:

> When Congress expressly delegates to an administrative agency the authority to make specific policy determinations, courts must give the agency's decision controlling weight unless it is 'arbitrary, capricious, or manifestly contrary to the statute.'" *ABF Freight System, Inc. v. National Labor Relations Board,* 510 U.S. 317, 324, 114 S.Ct. 835, 127 L.Ed.2d 152 (1994) (quoting *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694, (1984)); *accord Yeskey v. Commonwealth of Pennsylvania Department of Corrections,* 118 F.3d 168, 170 (3d Cir.1997) [*aff'd.* 524 U.S. 206, 118 S.Ct. 1952, 141 L.Ed.2d 215 (1998) ]; *see also Environmental Defense Fund, Inc. v. Costle,* 636 F.2d 1229, 1257 (D.C.Cir.1980) ("Deference to

the agency's interpretation is particularly appropriate where, as here, the statute specifically requires the agency to develop implementing regulations").

*Bryant v. New Jersey Dep't of Transp.,* 998 F.Supp. 438, 446 (D.N.J.1998) (Orlofsky, J.). *Bryant* involved a suit brought by residents of a predominantly African–American neighborhood, alleging that the New Jersey Department of Transportation's decision to construct a highway and tunnel through their neighborhood violated the Department of Transportation's Title VI implementing regulations prohibiting the siting of facilities which have a disparate impact on individuals based on their race, color, or national origin, 49 C.F.R. §§ 21.5(b)(3). Evaluating that claim, this Court concluded that "[the Department of Transportation's Title VI implementing regulation] is not arbitrary, capricious or manifestly contrary to Section 601." *Id.* at 446 (citation omitted). *See also, Mourning v. Family Publication Service, Inc.,* 411 U.S. 356, 369, 93 S.Ct. 1652, 36 L.Ed.2d 318 (explaining that "[w]here the empowering provision of a statute states simply that the agency may 'make ... such rules and regulations as may be necessary to carry out the provisions of this Act,' we have held that the validity of a regulation promulgated thereunder will be sustained so long as it is 'reasonably related to the purposes of the enabling legislation.' "); *Williamson Shaft Contracting Co. v. Phillips,* 794 F.2d 865, 869 (3rd Cir.1986) (same).

**4. The *Blessing* Test: Whether the EPA's § 602 Implementing Regulations Confer a Federal "Right" on Plaintiffs Enforceable Under § 1983**

**a. Whether the Regulations Promulgated Under § 602 Were Intended To Benefit Plaintiffs**

Applying the three-part *Blessing* analysis to Plaintiffs' claim in this case, the first

question this Court must address is whether the EPA's implementing regulations promulgated pursuant to § 602, *see* 40 C.F.R. § 7.10 *et seq.*, were intended to benefit a class which includes the Plaintiffs. *See Blessing*, 520 U.S. at 340, 117 S.Ct. 1353. This question is easily answered in the affirmative. Indeed, to paraphrase the Supreme Court, "there can be little doubt" that Title VI of the Civil Rights Act, and implementing regulations promulgated pursuant to § 602 of the Act, were intended to benefit the class of persons to which Plaintiffs belong, namely, persons of color. *See Wilder*, 496 U.S. at 510, 110 S.Ct. 2510.

First, for the reasons I have already set forth above, the EPA's implementing regulations must be considered in the context of the broader legislative and regulatory initiative mandated by Congress through the Civil Rights Act in general, and Title VI in particular, of which the EPA's implementing regulations are but a small part. "[To determine] [w]hether a statute creates a right, courts must look to the entire statute and its policy objective." *Elliot v. Chicago Housing Auth.*, No. 98–6307, 1999 WL 519200 (N.D.Ill. July 14, 1999) (citing *Pennhurst State School & Hospital v. Halderman*, 451 U.S. 1, 18, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981)). In enacting Title VI, Congress intended to benefit individuals who were subjected to discrimination. This legislative intent was succinctly articulated by Representative Lindsay:

> Everything in this proposed legislation has to do with providing a body of law which will surround and protect the individual from some power complex. This bill is designed for the protection of individuals. When an individual is wronged he can invoke the protection to himself, but if he is unable to do so because of economic distress or because of fear then the Federal Government is

authorized to invoke that individual protection for that individual. . . .

*Cannon v. Univ. of Chicago*, 441 U.S. at 704 n. 36, 99 S.Ct. 1946 (citing 110 Cong. Rec. 1540).

The Supreme Court has also summarized the intent of Congress when it enacted Title VI, as follows:

> Title IX, like its model Title VI, sought to accomplish two related, but nevertheless somewhat different, objectives. First, Congress wanted to avoid the use of federal resources to support discriminatory practices; second, it wanted to provide individual citizens effective protection against those practices. Both of these purposes were repeatedly identified in the debates on the two statutes.

*Cannon v. Univ. of Chicago*, 441 U.S. at 704, 99 S.Ct. 1946.

Of the ten individual plaintiffs in this case, seven are African–American and two are Hispanic. *SCCIA I*, 145 F.Supp.2d at 452. The organizational plaintiff, South Camden Citizens In Action, draws its membership from a neighborhood, Waterfront South, which is 91% persons of color. *Id.* Plaintiffs in this case clearly belong to the class of persons Congress intended to benefit in Title VI by prohibiting programs and activities which receive federal funds from discriminating against persons based on their race, § 601, and authorizing federal agencies to promulgate regulations to effectuate this prohibition, § 602.

Second, the specific language of the EPA's implementing regulations clearly reveals an intent to benefit individuals such as the Plaintiffs. The regulations explicitly state: "no *person* shall be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving EPA assistance on the basis of race, color, [or] national origin." 40 C.F.R.

§ 7.30 (emphasis added). This language is "mandatory and clear and therefore creates rights enforceable by individuals." *Marie O. v. Edgar*, 131 F.3d 610, 619 (7th Cir.1997) (applying *Blessing* and holding that handicapped children had right to "early intervention," based on the Individuals with Disabilities Act, 20 U.S.C. §§ 1471–1485, which was enforceable against the state by individuals under § 1983); *see also Johnson v. Guhl*, 91 F.Supp.2d 754, 768 (D.N.J.2000) (Bassler, J.) (applying *Blessing* and holding that institutionalized persons had rights under provisions of the Medicaid Act based, in part, on conclusion that "[a] plain reading of [the Medicaid Act] evidences that it is intended to benefit needy individuals,"); *Evergreen Presbyterian Ministries v. Hood*, 235 F.3d 908, 927 (5th Cir.2000) (applying *Blessing* and *Wilder* and holding that "[Medicaid] recipients are intended beneficiaries of [statute provision at issue] because the provision is 'phrased in terms' benefitting recipients").

In addition to this general prohibition, the EPA's Title VI implementing regulations specifically forbid recipients of federal funds from "using criteria or methods of administering [their] program[s] which have the effect of subjecting *individuals* to discrimination because of their race, color, national origin, or sex, or have the effect of defeating or substantially impacting the accomplishment of the objectives of the program with respect to individuals of a particular race, color, national origin, or sex." 40 C.F.R. § 7.35(b) (emphasis added). The EPA's regulations, promulgated at the express instruction of Congress in § 602, are "undoubtedly intended to benefit individuals such as the plaintiffs." *Reynolds v. Giuliani*, 35 F.Supp.2d 331, 341 (S.D.N.Y.1999) (applying *Blessing* and holding that qualified welfare beneficiaries have rights in the "timely, accurate, and fair" provision of food stamps under the

Food Stamp Act of 1977, 7 U.S.C. § 2011 and the Social Security Act, 42 U.S.C. § 1396 *et seq.*)

I find SLC's argument, that neither § 602 nor the EPA's implementing regulations were intended to benefit Plaintiffs, unpersuasive. SLC argues that "[a]s a preliminary matter, Congress did not intend for Section 602 to benefit Plaintiffs." SLC Suppl. Br. at 25. SLC contends that both § 602 and the EPA's implementing regulations are too broadly worded to invoke individual rights, that they create a "yardstick" for the "system-wide measurement" of services as opposed to an "individual entitlement," and are focused on funding recipients. To support this contention, SLC relies on the Supreme Court's decision in *Blessing*, in which the Court held that a particular provision of Title IV–D of the Social Security Act "does not give individual rights to force a state agency to substantially comply with Title IV–D." *Blessing*, 520 U.S. at 333, 117 S.Ct. 1353. As the following analysis makes clear, however, *Blessing* is clearly distinguishable from this case on both the facts and the law.

*Blessing* involved a suit brought by five custodial mothers whose children were eligible to receive child support services from the State under Title IV–D. To qualify for federal Aid to Families With Dependent Children ("AFDC") funds, states must certify that they will operate child support enforcement programs that conform with the requirements of Title IV D. These requirements place upon states the obligation to collect overdue support payments, establish a comprehensive system to establish paternity, locate absent parents, and help families obtain support orders. The state is required to provide these services free of charge to AFDC recipients, who must, in turn, assign their child support rights to the state. The

state may then keep most of the support payments it collects to offset the costs of providing welfare benefits; however, it is required to distribute a portion of the funds it collects to parents receiving AFDC, and all of the funds to parents who are not receiving AFDC. In *Blessing,* the plaintiffs alleged that the state was not in "substantial compliance" because its program was inadequately staffed, used outdated technology and suffered from other "structural defects." *Blessing,* 520 U.S. at 341–42, 117 S.Ct. 1353.

Contrary to SLC's assertion, in *Blessing* the Supreme Court did not conclude that Title IV D can *never* provide a basis for individual rights, but, rather, that plaintiffs in that case had failed to allege with adequate specificity the rights which they claimed were being violated, and instead, had merely alleged a violation of a general provision of the statute. The Supreme Court explained,

> We do not foreclose the possibility that some provisions of Title IV–D give rise to individual rights ... it is not at all apparent that [plaintiffs] sought any relief more specific than a declaration that their "rights" were being violated and an injunction forcing Arizona's child support agency to "substantially comply" with all of the provisions of Title IV D. We think that this defect is best addressed by sending the case back to the District Court to construe the complaint in the first instance, in order to determine exactly what rights, considered in their most concrete, specific form, [plaintiffs] are asserting.... [W]e leave open the possibility that Title IV–D may give rise to some individually enforceable rights.

*Blessing,* 520 U.S. at 346, 117 S.Ct. 1353 (emphasis added). *Cf.* SLC Suppl. Br. at 25 (stating that "[i]n *Blessing v. Freestone,* the Court determined that the plaintiffs had no private right under Section 1983 to enforce provisions of the Social Security Act.") What the Supreme Court did conclude in *Blessing* is that the provision upon which the *Blessing* plaintiffs relied, which requires states to be in "substantial compliance" with Title IV–D, was intended as a "yardstick" for the Secretary of Health and Human Services Appeals to measure the "system-wide" performance of a state's Title IV–D program, and that without more specific findings regarding the rights allegedly violated, this provision was inadequate to support individually enforceable rights. *Blessing,* 520 U.S. at 343, 117 S.Ct. 1353. Therefore, the Supreme Court held that the Ninth Circuit had erred in concluding that Title IV D created rights which were enforceable under § 1983 "without distinguishing among the numerous provisions of this complex program." *Blessing,* 520 U.S. at 333, 117 S.Ct. 1353 (stating that "[w]e disagree that the statutory scheme can be analyzed so generally"). According to the Supreme Court, the Ninth Circuit "did not engage in a methodical inquiry" as to the specific right(s) alleged, and instead took a "blanket approach" to determining whether Title IV D creates rights. *Id.* at 343–44, 117 S.Ct. 1353. The Court therefore remanded the case to the District Court.

In contrast to *Blessing,* Plaintiffs in this case have asserted a simple and specific right under the EPA's Title VI implementing regulations: to be free of disparate impact discrimination caused by the use, by a recipient of federal funds, of "criteria or methods" which have a discriminatory "effect" on individuals based on their race, color, or national origin. Plaintiffs assert that by undertaking an adverse disparate impact analysis prior to permitting the operation of polluting facilities, NJDEP would avoid such a discriminatory "effect." *See* Amd. Compl. at ¶¶ 84–96; 40 C.F.R.

§ 7.80.[10] Indeed, in accordance with the specific language of the regulations, as a condition of receiving federal funds, NJDEP has given its *assurance* that it will conduct a disparate impact analysis. Unlike the plaintiffs in *Blessing*, Plaintiffs in this case have not merely requested "substantial compliance" with a "general provision," but rather, have identified with precision both the regulatory provisions upon which they base their claim, 40 C.F.R. § 7.35(b), and the compliance they seek, namely, the performance of an adverse disparate impact assessment and consideration of the cumulative environmental burdens and community-specific health problems, as part of the NJDEP's permitting process. Amd. Compl. at ¶¶ 84–96; 102–107. And unlike the defendant state agency in *Blessing*, which was at least attempting to comply with the obligations it had assumed as a condition of accepting federal funds, though the *Blessing* plaintiffs alleged its attempt was insufficient, the NJDEP in this case has flatly denied that it has any obligations whatsoever to Plaintiffs beyond ensuring that permitted facilities comply with environmental emissions standards. Yet, as I noted in *SCCIA I*, the EPA has explicitly stated that "[c]ompliance with environmental laws does not constitute *per se* compliance with Title VI.... *A recipient's Title VI obligation exists in addition to the Federal or state environmental laws governing its environmental permitting program."* 65 Fed. Reg. 39650, 39680 (emphasis added). Also in *SCCIA I*, I noted that the NJDEP has, in numerous other fora, recognized its obligation to perform a disparate impact analysis, and in fact, notified SLC that such an analysis might be necessary prior to SLC's construction of the proposed facility.[11]

Following the Supreme Court's instruction in *Blessing*, I have undertaken a methodical analysis of the right asserted by Plaintiffs. Based on the Congressional intent in enacting Title VI, the Supreme Court's recognition that Title VI assigned to federal agencies the responsibility for promulgating regulations designed to implement the purposes of Title VI, and the plain language of the EPA's § 602 implementing regulations, as further clarified by the Guidances, I conclude that the Plaintiffs have satisfied the first part of the *Blessing* test, which requires them to demonstrate that they belong to the class of persons which the regulations were intended to benefit.

**b. Whether "the Right Assertedly Protected by the Provision is so 'Vague and Amorphous' that its Enforcement would Strain Judicial Competence"**

The second part of the *Blessing* test requires an analysis of whether the right

---

**10.** 40 C.F.R. § 7.80 provides, in relevant part, as follows:

(a) Assurances

(1) General. Applicants for EPA assistance shall submit an assurance with their applications stating that, with respect to their programs or activities that receive EPA assistance, they will comply with the requirements of this Part. Applicants must also submit any other information that the OCR determines is necessary for preaward review. The applicant's acceptance of EPA assistance is an acceptance of the obligation of this assurance and this Part.

**11.** The NJDEP advised SLC, by letter dated September 2, 1999, well before SLC began construction, that "[d]ue to the fact that St. Lawrence will be operating in an economically depressed area which has a substantial minority population, the Department will evaluate the need to conduct a Environmental Justice analysis." Pomar Cert., Exh. B at B–2. As I noted in *SCCIA I*, "[i]nexplicably, the NJDEP never undertook such an analysis, which is precisely what prompted Plaintiffs to file the present suit." *SCCIA I*, 145 F.Supp.2d at 501 n. 14.

which Plaintiffs are asserting is "so vague and 'amorphous' that its enforcement would strain judicial competence." *Blessing*, 520 U.S. at 341, 117 S.Ct. 1353. There is no ambiguity in the EPA's Title VI implementing regulations; rather, they clearly state that: "No person shall be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving EPA assistance on the basis of race, color, national origin." 40 C.F.R. § 7.30. Furthermore, the regulations specifically and unambiguously prohibit disparate impact discrimination. 40 C.F.R. § 7.35(b)(stating that "[a] recipient shall not use criteria or methods of administering its program which have the effect of subjecting individuals to discrimination because of their race, color, national origin, or sex, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program with respect to individuals of a particular race, color, national origin, or sex.")

This Court need not speculate about judicial competence to enforce federal regulations prohibiting disparate impact discrimination, promulgated pursuant to Title VI, because a substantial body of case law already exists which demonstrates the capacity of the federal judiciary to perform exactly this analysis. *See, e.g., Powell v. Ridge*, 189 F.3d 387 (3d Cir.1999), *cert. denied*, 528 U.S. 1046, 120 S.Ct. 579, 145 L.Ed.2d 482 (1999); *New York Urban League v. State of New York*, 71 F.3d 1031 (2d Cir.1995); *Ferguson v. Charleston*, 186 F.3d 469 (4th Cir.1999), *rev'd on other grounds*, —— U.S. ——, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001); *David K. v. Lane*, 839

F.2d 1265, 1274 (7th Cir.1988); *City of Chicago v. Lindley*, 66 F.3d 819 (7th Cir. 1995); *Larry P. v. Riles*, 793 F.2d 969 (9th Cir.1984); *Villanueva v. Carere*, 85 F.3d 481 (10th Cir.1996); *Elston v. Talladega Board of Educ.*, 997 F.2d 1394 (11th Cir. 1993).[12] Indeed, as the foregoing cases demonstrate, federal courts have enforced rights created by Title VI disparate impact regulations in contexts as diverse as public education, *see, e.g., Powell*, 189 F.3d 387; housing, *see, e.g., 3004 Albany Crescent Tenants' Assoc. v. City of New York*, No. 95–10662, 1997 WL 225825 (S.D.N.Y. May 5, 1997); and transportation, *see, e.g., New York Urban League*, 71 F.3d 1031 Finally, the ability of federal courts to enforce the specific rights created by the EPA's Title VI implementing regulations, 40 C.F.R. § 7.10, *et seq.*, has been demonstrated on at least two occasions. *See New York City Environmental Justice Alliance ("NYCE-JA") v. Giuliani*, 214 F.3d 65 (2d Cir. 2000); *Chester Residents Concerned for Quality Living v. Seif*, 132 F.3d 925 (3d Cir.1997), *cert. granted*, 524 U.S. 915, 118 S.Ct. 2296, 141 L.Ed.2d 156 (1998), *decision vacated and certiorari dismissed as moot*, 524 U.S. 974, 119 S.Ct. 22, 141 L.Ed.2d 783 (1998).

The fact that the Title VI disparate impact analysis is modeled on the analysis developed by federal courts to analyze disparate impact in the context of Title VII further supports my conclusion that the enforcement of the right to challenge a facially neutral practice, which has an alleged adverse disparate impact on persons based on their race, is well within the competence of the judiciary. *See Powell*,

---

**12.** The fact that many of these decisions assumed the existence of a private right of action under § 602, and have subsequently been overruled by *Sandoval* on that point, is irrelevant to their precedential value in demonstrating the ability of courts to apply and enforce disparate impact regulations promulgated to implement Title VI, the validity of which are unaffected by *Sandoval* as specifically noted in Justice Scalia's majority Opinion.

189 F.3d at 393 (stating that "[a]lthough the Supreme Court has not yet spoken on the issue, the courts of appeals have generally agreed that the parties' respective burdens in a Title VI disparate impact case should follow those developed in Title VII cases").[13] As articulated by the Third Circuit, the analysis to be used in evaluating a Title VI disparate impact claim is as follows:

> [A] plaintiff in a Title VI disparate impact suit bears the initial burden of establishing a prima facie case that a facially neutral practice has resulted in a racial disparity. *See Ferguson v. City of Charleston*, 186 F.3d 469 (4th Cir.1999); *New York Urban League*, 71 F.3d at 1036; *Elston*, 997 F.2d at 1407. If the plaintiff meets that burden, then the defendant must establish a "substantial legitimate justification," *see New York Urban League*, 71 F.3d at 1036, or a "legitimate, nondiscriminatory reason[ ]," *Medical Ctr. Inc.*, 657 F.2d at 1331, for the practice. *See Georgia State Conference of Branches of NAACP v. Georgia*, 775 F.2d 1403, 1417 (11th Cir.1985). Once the defendant meets its rebuttal burden, the plaintiff must then establish either that the defendant overlooked an equally effective alternative with less discriminatory effects or that the proffered justification is no more than a pretext for racial discrimination. *See Georgia State Conference*, 775 F.2d at 1417. *Powell*, 189 F.3d at 393–94.

The disparate impact cause of action was first announced by the Supreme Court in the context of Title VII, in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The burden-shifting analysis described above was articulated in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and has been routinely applied by federal courts to evaluate allegations of disparate impact in a variety of contexts, including but not limited to Title VI. *See, e.g., City of Rome v. United States*, 446 U.S. 156, 172–173, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980) (construing § 5 of the Voting Rights Act).

Based on the well-developed contours of disparate impact jurisprudence, and the experience federal courts have in applying disparate impact analysis in a variety of contexts, including Title VI implementing regulations, I conclude that the right asserted by Plaintiffs, to be free of discrimination resulting from the adverse disparate impact of a facially neutral policy implemented by a recipient of federal funding, is neither vague, nor amorphous, and is well within the competence of the judiciary to enforce.

#### c. Whether the Provision "Unambiguously Imposes a Binding Obligation on the States"

The final factor in the *Blessing* analysis requires this Court to consider whether the provision in question "unambiguously imposes a binding obligation on states." *Blessing*, 520 U.S. at 341, 117 S.Ct. 1353. "In other words, the provision giving rise to the asserted right must be couched in mandatory, rather than precatory, terms" to create a right enforceable under § 1983. *Id.* Provisions which indicate "no more than a confessional preference—at most a 'nudge' in the preferred directio[n]" are not intended to, and therefore, according to the Supreme Court, cannot, rise to the

---

**13.** *See also, New York Urban League, Inc. v. New York*, 71 F.3d at 1036; *City of Chicago v. Lindley*, 66 F.3d at 828–29 & n. 12; *Elston v. Talladega County Bd. of Educ.*, 997 F.2d at 1407; *cf. NAACP v. Medical Ctr., Inc.*, 657 F.2d 1322, 1333 (3d Cir.1981) (en banc) (accepting without comment parties' suggestion that "the decisional law allocating the burden of production and persuasion under Title VII is instructive in [a Title VI] case").

level of an enforceable right. *Wright,* 479 U.S. at 423, 107 S.Ct. 766 (citing *Pennhurst,* 451 U.S. at 19, 101 S.Ct. 1531).

An analysis of the language of Title VI and of the EPA's implementing regulation reveals that Congress intended to place mandatory obligations on recipients of federal funding. Section 601 states that "no person *shall,* on the ground of race, color, or national origin" be subjected to discrimination under any program which receives federal funding. 42 U.S.C. § 2000d (emphasis added). Section 602 "authorized and *directed*" federal agencies to develop regulations which implemented the objectives of Title VI. 42 U.S.C. § 2000d–1 (emphasis added). The EPA's implementing regulations incorporate the mandatory language of section 601 into the general anti-discrimination provision, 40 C.F.R. § 7.30 (explaining that "[n]o person *shall* ...."). The implementing regulations address the issue of disparate impact discrimination with particularity under the section titled "specific provisions," stating that recipients of federal funding "*shall not* use criteria or methods of administering their program[s] which have the effect of subjecting individuals to discrimination because of their race, color, national origin, or sex, or have the effect of defeating or substantially impairing accomplishment of the objectives of the program with respect to individuals of a particular race, color, national origin, or sex." 40 C.F.R. § 7.35(b).

The use of the term "shall" indicates a mandatory obligation. *See, e.g., Marie O. v. Edgar,* 131 F.3d at 620 (explaining that "[t]he statutory language ... is direct: it uses 'shall' and 'required.' The natural meaning of these terms is mandatory, not precatory"); *Johnson v. Guhl,* 91 F.Supp.2d 754, 769 (D.N.J.2000) (Bassler, J.) (stating that "[t]he use of the word 'shall' in § 1396p(c)(2)(D) makes the [provision] mandatory rather than precatory").

The fact that Congress conditioned the receipt of federal funding on compliance with Title VI further indicates the mandatory, rather than precatory, nature of the States' obligation. *See, e.g., Doe v. Chiles,* 136 F.3d 709, 718 (11th Cir.1998)(applying *Blessing* and noting that the fact that federal funding was predicated on compliance with Medicaid statute indicated that compliance was mandatory in satisfaction of the third *Blessing* factor).

To paraphrase the Supreme Court's language in *Wilder,* Title VI and the EPA's implementing regulations "succinctly set forth a congressional command which ... is wholly uncharacteristic of a mere suggestion or nudge." *Wilder,* 496 U.S. at 498, 110 S.Ct. 2510 (citation omitted). Accordingly, I conclude that Title VI, and specifically the EPA's implementing regulations promulgated thereunder, unambiguously impose a binding obligation on states in satisfaction of the third *Blessing* factor.

### 5. Whether Congress Has Expressly or Impliedly Foreclosed Plaintiffs' Ability to Enforce the EPA's Disparate Impact Regulations, Promulgated Pursuant to Title VI, Under § 1983

Because I have concluded that Plaintiffs have asserted the violation of a "federal right," the Plaintiffs are entitled to a "rebuttable presumption that the right is enforceable under § 1983." *Powell,* 189 F.3d at 401 (citing *Blessing,* 520 U.S. at 341, 117 S.Ct. 1353). The presumption arises because Congress is "presumed to legislate against the background of section 1983 and thus to contemplate private enforcement of the relevant statute against state and municipal actors absent fairly discernible congressional intent to the contrary." *Samuels v. District of Columbia,* 770 F.2d 184,

194 (D.C.Cir.1985). As the Third Circuit recently explained,

> The presumption is rebutted if Congress specifically foreclosed a remedy under § 1983 ... either expressly, by forbidding recourse to § 1983, or impliedly, by creating a comprehensive enforcement scheme that is incompatible with individual enforcement under § 1983.

*Powell,* 189 F.3d at 401 (citations and internal quotations omitted). The Supreme Court has stated that this is a difficult presumption to overcome:

> We do not lightly conclude that Congress intended to preclude reliance on § 1983 as a remedy for the deprivation of a federally secured right. The burden is on the State to show by express provision or other specific evidence from the statute itself that Congress intended to foreclose such private enforcement.

*Wilder,* 496 U.S. at 520–21, 110 S.Ct. 2510.

The Third Circuit has already held, and Defendants do not dispute, that "[n]either Title VI nor the regulations promulgated thereunder purports to restrict the availability of relief under § 1983." *Powell,*

189 F.3d at 401. "Defendants thus 'must make the difficult showing that allowing a § 1983 action to go forward in these circumstances would be inconsistent with Congress' carefully tailored scheme.'" *Id.* (quoting *Blessing,* 520 U.S. at 346, 117 S.Ct. 1353).

SLC and the NJDEP contend that the EPA's Title VI implementing regulations create a comprehensive enforcement scheme which demonstrates that Congress implicitly intended to preclude plaintiffs from pursuing a § 1983 action. Specifically, Defendants argue that Plaintiffs are foreclosed from seeking a remedy under § 1983 because: (1) the EPA's § 602 regulations require recipients to provide grievance proceedings (which the NJDEP did not), *see* 40 C.F.R. § 7.90; [14] (2) the regulations define "Agency Compliance Procedures" which EPA will utilize to secure compliance, *see* 40 C.F.R. § 7.105 *et seq.;* and (3) the EPA Administrator is authorized, under § 602, to withdraw federal funding from a recipient in the event of noncompliance, *see* 42 U.S.C. § 602.[15] To evaluate Defendants' arguments, I shall

---

**14.** This section provides, in relevant part, as follows: "Each recipient shall adopt grievance procedures that assure the prompt and fair resolution of complaints which allege violation of this part." 40 C.F.R. § 7.90.

**15.** Section 602 provides, in relevant part, as follows:

> Compliance with any requirement adopted pursuant to this section may be effected (1) by the termination of or refusal to grant or to continue assistance under such program or activity to any recipient as to whom there has been an express finding on the record, after opportunity for hearing, of a failure to comply with such requirement, but such termination or refusal shall be limited to the particular political entity, or part thereof, or other recipient as to whom such a finding has been made and, shall be limited in its effect to the particular program, or part thereof, in which such noncompliance has been so found, or (2) by any

other means authorized by law: Provided, however, That no such action shall be taken until the department or agency concerned has advised the appropriate person or persons of the failure to comply with the requirement and has determined that compliance cannot be secured by voluntary means. In the case of any action terminating, or refusing to grant or continue, assistance because of failure to comply with a requirement imposed pursuant to this section, the head of the Federal department or agency shall file with the committees of the House and Senate having legislative jurisdiction over the program or activity involved a full written report of the circumstances and the grounds for such action. No such action shall become effective until thirty days have elapsed after the filing of such report.

42 U.S.C. § 602.

first consider Supreme Court precedent specifically addressing the question of implied Congressional preclusion of a remedy under § 1983. I shall then consider the implications, if any, of the Supreme Court's recent decision in *Sandoval* on this analysis.

Over the last two decades, the Supreme Court has developed a substantial body of jurisprudence addressing the enforceability of federal rights under § 1983. *See, e.g., Middlesex County Sewerage Auth. v. Nat'l Sea Clammers Assoc.*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981); *Pennhurst State School and Hosp. v. Halderman*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981); *Smith v. Robinson*, 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984); *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 110 S.Ct. 444, 107 L.Ed.2d 420 (1989); *Wilder v. Va. Hosp. Ass'n*, 496 U.S. 498, 110 S.Ct. 2510, 110 L.Ed.2d 455 (1990); *Suter v. Artist M*, 503 U.S. 347, 112 S.Ct. 1360, 118 L.Ed.2d 1 (1992); *Livadas v. Bradshaw*, 512 U.S. 107, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994); *Blessing v. Freestone*, 520 U.S. 329, 117 S.Ct. 1353, 137 L.Ed.2d 569 (1997).

Given the presumption of enforceability under § 1983, however, it is perhaps not surprising that the Court recently acknowledged that "[o]nly twice have we found a remedial scheme sufficiently comprehensive to supplant § 1983." *Blessing*, 520 U.S. at 347, 117 S.Ct. 1353 (citing *Sea Clammers*, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435, and *Smith v. Robinson*, 468 U.S. 992, 104 S.Ct. 3457, 82 L.Ed.2d 746 (1984), *superceded by statute*, 20 U.S.C. § 1415). The Court described its reasoning in *Sea Clammers* and *Smith v. Robinson* as follows:

> In *Sea Clammers*, we focused on the "unusually elaborate" enforcement provisions of the Federal Water Pollution Control Act, which placed at the disposal of the Environmental Protection Agency a panoply of enforcement options, including noncompliance orders, civil suits, and criminal penalties. 453 U.S. at 13, 101 S.Ct. 2615. We emphasized that several provisions of the Act authorized private persons to initiate enforcement actions. We found it "hard to believe that Congress intended to preserve the § 1983 right of action when it created so many specific statutory remedies, including the two citizen suit provisions." *Id.* at 20, 101 S.Ct. 2615. Likewise, in *Smith*, the review scheme in the Education of the Handicapped Act permitted aggrieved individuals to invoke "carefully tailored" local administrative procedures followed by federal judicial review. We reasoned that Congress could not possibly have wanted parents to skip these procedures and go straight to court by of § 1983, since that would have "render[ed] superfluous most of the detailed procedural protections outlined in the statute." *Id.* at 1011, 104 S.Ct. 3457.

*Blessing*, 520 U.S. at 347, 117 S.Ct. 1353.

After reviewing *Sea Clammers* and *Smith v. Robinson*, the Court cautioned that "we have [ ] stressed that a plaintiff's ability to invoke § 1983 *cannot be defeated simply by '[t]he availability of administrative mechanisms to protect the plaintiff's interests.'* " *Id.* (quoting *Golden State*, 493 U.S. at 106, 110 S.Ct. 444)(emphasis added). For example, in *Wright*, the Court "rejected the argument that the Secretary of Housing and Urban Development's 'generalized powers' to audit local public housing authorities, to enforce annual contributions contracts, and to cut off federal funding demonstrated a congressional intention to prevent public housing tenants from using § 1983 to enforce their rights under the federal Housing Act."

*Blessing,* 520 U.S. at 348, 117 S.Ct. 1353 (quoting *Wright,* 479 U.S. at 428, 107 S.Ct. 766). Similarly, in *Wilder,* the Court held that the Secretary of Health and Human Services' power to reject state Medicaid plans or to withhold federal funding to states whose plans did not comply with federal law did not preempt an individual from seeking to enforce rights created by the relevant provision through § 1983. *See Wilder,* 496 U.S. at 523, 110 S.Ct. 2510; *Blessing,* 520 U.S. at 348, 117 S.Ct. 1353. As the Supreme Court in *Blessing* concluded, "[e]ven though in both [*Wilder* and *Smith v. Robinson* ] these oversight powers were accompanied by limited state grievance procedures for individuals, we found that § 1983 was still available." *Blessing,* 520 U.S. at 348, 117 S.Ct. 1353.

Based on my review of applicable Supreme Court precedent, I conclude that the enforcement scheme created by the EPA hardly qualifies as "an elaborate enforcement provision" such as those which the Supreme Court considered in *Sea Clammers* and *Smith v. Robinson.* For example, the statute which was the subject of the litigation in *Sea Clammers* contained detailed procedural provisions for citizen suits to be brought under the statute, which plaintiffs in that case had ignored, including notice requirements which mandated that plaintiffs notify the EPA before filing suit. *Sea Clammers,* 453 U.S. at 8; *see also* 28 U.S.C. § 1331, 33 U.S.C. §§ 1415(g) and 1365(b)(1)(A). In contrast, Congress did not create such a scheme in

Title VI, but instead included a general provision for the termination of federal funding, and deferred to federal agencies to articulate standards for compliance with Title VI's anti-discrimination provisions. *See* 42 U.S.C. § 2000d–1. In *Wright,* 479 U.S. at 428, 107 S.Ct. 766, the Supreme Court specifically held that the power to terminate funding is a "generalized power" which is "insufficient to indicate a congressional intention to foreclose § 1983 remedies." *Id.; see also Blessing,* 520 U.S. at 348, 117 S.Ct. 1353 (rejecting defendants' claim that Title IV–D of the Social Security Act precluded individual enforcement under § 1983 because it provided only the "limited powers to audit and cut funding").

Furthermore, the EPA's Title VI implementing regulations, while establishing an administrative mechanism for the review of complaints, do not contain any provisions which demonstrate an intent to foreclose individuals from pursuing remedies for alleged violations under § 1983. *See* 40 C.F.R. §§ 7.105, 7.135. In fact, EPA's recently issued Draft Revised Guidance for Investigating Title VI Administrative Complaints Challenging Permits ("Draft Investigation Guidance"), 65 Fed.Reg. 39650, 39673 (June 27, 2000), recognizes and specifically addresses the possibility that individuals will seek judicial relief to vindicate their right to be free of discrimination caused by the adverse disparate impact of a facially neutral environmental permitting policy implemented by a federally funded agency. *Id.*[16] Paraphrasing

16. For example, the Draft Investigation Guidance provides, in relevant part, as follows: [The EPA's Office of Civil Rights ["OCR"] will generally dismiss complaints without prejudice that are the subject of either ongoing administrative permit appeals or litigation in Federal or state court ... In such cases, OCR believes that it should await the results of the permit appeal or litigation ... OCR expects to waive the time limit to

allow complainants to refile their complaints after the appeal or litigation, rather than conduct a simultaneous investigation on the basis of facts that may change due to the outcome of the administrative appeal or litigation ... OCR may chose not to proceed with a complaint investigation if the allegations in the complaint were actually litigated and substantively decided by Federal court. For example, if a Federal Court

the Supreme Court's conclusion in *Wright,* I conclude that not only are Title VI and the EPA's implementing regulations "devoid of any express indication that exclusive enforcement authority was vested in" the EPA, but also that the EPA's actions "indicate that enforcement authority is not centralized and private actions were anticipated." *Wright,* 479 U.S. at 424, 107 S.Ct. 766.

The Supreme Court's recent decision in *Sandoval* does not affect my conclusion. As I have explained, the *Sandoval* decision required the application of a *different* analysis (the four-factor *Cort* analysis) to address a *different* question (whether § 602 itself creates a "freestanding private cause of action"). Nonetheless, SLC contends that Justice Scalia's description of § 602's restrictions on agency enforcement as "elaborate," albeit in the course of an entirely different analysis, compels this Court to conclude that Congress intended to foreclose plaintiffs from seeking to vindicate rights created by Title VI and its implementing regulations under § 1983. SLC Second Suppl. Br. at 2. Yet Justice Scalia himself, in *Sandoval,* commented on the distinction in the analyses used to evaluate implied private right of action claims and § 1983 claims, and noted that the plaintiffs' claim in *Sandoval* did not require the Court to consider whether the remedies provided in § 602 could overcome the strong presumption created in favor of enforceability under § 1983:

> And as our Rev. Stat. § 1979, 42 U.S.C. § 1983 cases show, some remedial schemes foreclose a private cause of ac-

tion to enforce even those statutes that admittedly create substantive private rights. *See, e.g., Middlesex County Sewerage Authority v. National Sea Clammers Assn.,* 453 U.S. 1, 19–20, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981). In the present case, the claim of exclusivity for the express remedial scheme does not even have to overcome such obstacles. The question whether § 602's remedial scheme can overbear other evidence of congressional intent is simply *not presented* . . . .

*Sandoval,* —— U.S. ——, ——, 121 S.Ct. 1511, 1522, 149 L.Ed.2d 517. It is clear from the language I have just quoted that Justice Scalia's *dicta* in *Sandoval* cannot be read to support the conclusion which SLC would have this Court reach, namely, that § 602's enforcement mechanisms are so "elaborate" that they overcome § 1983's presumption in favor of a plaintiff's ability to enforce federal rights under § 1983.

Based on a review of applicable Supreme Court precedent, the Supreme Court's recent decision in *Sandoval,* and consideration of the plain language of the EPA's implementing regulations, I conclude that the limited, generalized enforcement power of the EPA to enforce Title VI and the implementing regulations promulgated thereunder is insufficient to meet the high threshold the Supreme Court has established for regulations which may be deemed so comprehensive that they demonstrate a Congressional intent to foreclose recourse to § 1983.

---

reviewed evidence presented by both parties and issued a decision that stated the allegations of discrimination were not true, OCR may chose not to investigate allegations in the complaint that deal with those same issues ... Generally, OCR may choose to investigate if the complaint raises issues that were not actually litigated or substantively decided by a Federal court, or if it raises unique and important legal or policy issues. OCR may look for guidance to judicial principles and other provisions of law on how prior court decisions may affect OCR's determination of whether to investigate a complaint.]
65 Fed.Reg. at 39673.

## IV. The Availability of Injunctive and Declaratory Relief in this Case

■■■■ SLC, NJDEP and Commissioner Shinn contend that vacating the air permits issued by NJDEP to SLC to allow its proposed facility to operate constitutes prohibited retrospective relief in violation of the Eleventh Amendment. *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), however, created an exception to the Eleventh Amendment which permits federal courts to grant prospective injunctive relief against state officials to prevent a continuing violation of federal law. *Id.* at 155–56, 28 S.Ct. 441. Suits against state officials, such as Commissioner Shinn, for prospective injunctive relief under § 1983 are not barred by the Eleventh Amendment. *Will v. Michigan Dep't of State Police,* 491 U.S. 58, 71 n. 10, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). As the Supreme Court noted in *Will:*

> Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because "official-capacity actions for prospective relief are not treated as actions against the State." *Kentucky v. Graham,* 473 U.S. 159, 167 n. 14, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985); *Ex Parte Young,* 209 U.S. 123, 159–160, 28 S.Ct. 441, 52 L.Ed. 714 (1908).

*Id.*

Notwithstanding the plain language of *Will* set forth above, the NJDEP has cited *Will* for the proposition that Plaintiffs cannot seek relief against the NJDEP under § 1983 because the NJDEP is not a "person" within the meaning of § 1983. NJDEP Suppl. Br. at 9. While this argument is true as far as the NJDEP is concerned, the NJDEP's failure to cite the language of *Will* as it relates to an "official capacity" suit against Commissioner Shinn is disingenuous and may well constitute a violation of RPC 3.3.(a).[17]

In *SCCIA I,* this Court issued a declaratory judgment that:

> the NJDEP and Commissioner Shinn have violated Title VI of the Civil Rights Act by failing to consider the potential adverse, disparate impact of the SLC's facility's operation on individuals based on their race, color, or national origin, as part of its decision to permit SLC's proposed facility.

*SCCIA I,* 145 F.Supp.2d at 480. As the Supreme Court has noted, "declaratory relief may be available even though an injunction is not," *Green v. Mansour,* 474 U.S. 64, 72, 106 S.Ct. 423, 88 L.Ed.2d 371 (1985), *citing Steffel v. Thompson,* 415 U.S. 452, 462, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974) and "[t]he propriety of issuing a declaratory judgment may depend upon equitable considerations, ... (citation omitted) ..." *Id.*

The issuance of a declaratory judgment in this case will impose no burden on the state treasury and is ancillary to the injunctive relief issued by this Court, which enjoins ongoing violations of federal law, specifically, Title VI of the Civil Rights Act of 1964 and the EPA's implementing regulations promulgated thereto, codified at 40 C.F.R. § 7.10 *et seq.* Moreover, the in-

---

17. RPC 3.3(a)(3), Candor Toward the Tribunal, provides:

   (a) A lawyer shall not knowingly:

      *     *     *     *     *     *

   (3) fail to disclose to the tribunal legal authority in the controlling jurisdiction known to the lawyer to be directly adverse to the position of the client and not disclosed by opposing counsel.

junctive relief issued in this case is narrowly tailored to remedy the violation of Title VI which this Court has found. Commissioner Shinn must reconsider the air permits previously issued to SLC in light of the disparate impact regulations promulgated by the EPA. To suggest that this Court's declaratory judgment vacating the air permits issued to SLC is inappropriate retrospective relief barred by the Eleventh Amendment would exalt form over substance. Far more onerous burdens imposed by injunctive relief ordered by federal courts have been upheld by the Supreme Court. In *Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977), a school desegregation case, the Supreme Court upheld an injunction which required state officials to pay one-half the future costs of remedial educational requirements ordered by the District Court. As the Court noted:

> The decree to share the future costs of educational components in this case fits squarely within the prospective-compliance exception reaffirmed by *Edelman.* [*Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) ]. That exception, which had its genesis in *Ex Parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908) permits federal courts to enjoin state officials to conform their conduct to requirements of federal law, notwithstanding a direct and substantial impact on the state treasury (citation omitted).

*Id.* at 289, 97 S.Ct. 2749.

Moreover, the Supreme Court has recognized that its Eleventh Amendment jurisprudence is often an exercise in "linedrawing" guided by the principles of *Ex Parte Young:*

> For Eleventh Amendment purposes, the line between permitted and prohibited suits will often be indistinct: "[T]he difference between the type of relief barred by the Eleventh Amendment and that permitted by *Ex Parte Young* will not in many instances be that between day and night (citation omitted)." In discerning on which side of the line a particular case falls we look to the substance rather than to the form of the relief sought, (citation omitted), and will be guided by the policies underlying the decision in *Ex Parte Young.*

*B.H. Papasan v. Allain,* 478 U.S. 265, 278–279, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986).

Given the narrowly-tailored nature of the relief ordered in this case, the continuing violation of federal law to be enjoined, the fact that vacating the air permits previously issued to SLC is ancillary to the injunctive relief ordered, and the insignificant impact on the state treasury, I conclude that the relief ordered in this case is not barred by the Eleventh Amendment.[18]

---

18. The parties have not addressed whether the State of New Jersey, and in this case, the NJDEP, has waived its Eleventh Amendment immunity under 42 U.S.C. § 2000d–7, which provides in relevant part: "[a] State shall not be immune under the Eleventh Amendment ... from suit in Federal Court for a violation of ... Title VI of the Civil Rights Act of 1964 ... by recipients of federal financial assistance." Virtually every federal court to have construed § 2000d–7 has concluded that it validly and effectively waives the Eleventh Amendment immunity of a state once the state accepts federal funds. *See Robinson v. Kansas,* 117 F.Supp.2d 1124, 1132–33 (D.Kan.2000). It is undisputed that the NJDEP is a recipient of federal financial assistance under Title VI, and is subject to the waiver of the Eleventh Amendment contained in § 2000d–7. Since the parties did not cite, much less brief the applicability of § 2000d–7 to this case, I need not address the question at this time. I note, however, that § 2000d–7 cuts a clear path through the thicket created by *Ex Parte Young* and its progeny.

## V. CONCLUSION

For the reasons set forth above, I conclude that Plaintiffs may enforce the disparate impact regulations promulgated by the EPA pursuant to § 602 of Title VI under 42 U.S.C. § 1983. Accordingly, this Court's Order of April 19, 2001 shall remain in full force and effect. SLC's Motion to Vacate Opinion and Order, or, in the Alternative, for Stay of Order Pending Appeal, shall be denied. The Court will enter an appropriate form of order.

### ORDER

This matter having come before the Court on its own motion and the motion of Defendant–Intervenor, St. Lawrence Cement Co., L.L.C., to Vacate Opinion and Order of April 19, 2001, or in the Alternative, for Stay of Opinion Pending Appeal, Brian S. Montag, Esq. and Catherine A. Trinkle, Esq., Pitney, Hardin, Kipp & Szuch, LLP, appearing on behalf of Defendant–Intervenor, St. Lawrence Cement Co., L.L.C., Olga D. Pomar, Esq., Camden Regional Legal Services, Inc., Jerome Balter, Esq. and Michael Churchill, Esq., Public Interest Law Center of Philadelphia, and Luke W. Cole, Esq., Center on Race, Poverty and the Environment, appearing on behalf of Plaintiffs, John J. Farmer, Jr., Esq., Attorney General of New Jersey and James M. Murphy, Esq., Deputy Attorney General, appearing on behalf of Defendants, New Jersey Department of Environmental Protection and Commissioner Robert C. Shinn, and;

The Court, having considered the supplemental briefs of the parties, and;

For the reasons set forth in the OPINION filed concurrently with this ORDER, IT IS on this 10th day of May, 2001, hereby ORDERED that:

1. The Motion of Defendant Intervenor, St. Lawrence Cement Co., L.L.C., to Vacate Opinion and Order of April 19, 2001, or in the Alternative, for Stay of Opinion Pending Appeal, is denied;

2. This Court's Opinion and Order of April 19, 2001 shall remain in full force and effect except as modified by this Order and the Opinion filed concurrently with this Order;

3. Plaintiffs' motion for a preliminary injunction is granted;

4. The air permits issued by the New Jersey Department of Environmental Protection to St. Lawrence Cement Co., L.L.C. are vacated;

5. St. Lawrence Cement Co., L.L.C. is enjoined from operating its proposed facility until further Order of this Court;

6. This case is remanded to the New Jersey Department of Environmental Protection and Commissioner Shinn to make appropriate findings consistent with this Court's Opinion of April 19, 2001 and the Opinion filed concurrently with this Order;

7. The findings made by the New Jersey Department of Environmental Protection and Commissioner Shinn shall be filed with this Court within thirty days of the date of this Order;

8. This Court shall retain jurisdiction of this case.